Mark W. Pugsley (8253)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543

William T. Reid, IV (*pro hac vice pending*)
Gregory S. Schwegmann (*pro hac vice pending*)
Seth S. Harp (*pro hac vice pending*)
REID COLLINS & TSAI LLP
1301 S. Cap. of Texas Hwy, Suite C300
Austin, Texas 78746
Telephone: (512) 647-6100
Facsimile: (512) 647-6129

*Attorneys for Plaintiff Gil A. Miller, as the Trustee of the Randall Victims Private Actions Trust*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| GIL A. MILLER, in his capacity as the Trustee of the Randall Victims Private Actions Trust<br><br>       Plaintiff,<br><br>vs.<br><br>UNION CENTRAL LIFE INSURANCE COMPANY, AMERITAS LIFE INSURANCE CORP., AMERITAS LIFE INSURANCE CORP. OF NEW YORK, AND ACACIA LIFE INSURANCE COMPANY,<br><br>       Defendants. | **COMPLAINT**<br><br>Case No. _____<br><br>Judge: _____<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gil A. Miller, in his capacity as the Trustee of the Randall Victims Private Actions Trust (the "Victims PAT") established pursuant to the *Chapter 11 Trustee's Liquidating Plan of Reorganization Dated September 9, 2013* [Docket No. 1268] (the "Plan") which was confirmed in Bankruptcy Case No. 10-37546 now pending in the United States Bankruptcy Court for the District of Utah, hereby files this complaint against Defendants Union Central Life Insurance Company, Ameritas Life Insurance Corp. ("Ameritas"), Ameritas Life Insurance Corp. of New York, and Acacia Life Insurance Company (collectively "Union Central") and respectfully states as follows:

## NATURE OF THE CASE

1.      Plaintiff is acting on behalf of the beneficiaries of the Victims PAT (the "Victims"), each of whom were defrauded by Union Central's general agent for the state of Utah, Dee Randall.  Defendant Union Central is a life insurance company.  As described on its website, Union Central offers life insurance, disability insurance, and annuity products to the public "in a highly welcoming, highly ethical, highly professional manner that builds lasting trust and enduring relationships."  Union Central distributes its insurance and financial products through a network of general agents and sub-agents.  These agents function as Union Central's sales representatives and, because they are the primary point of contact with clients, they are also its public face.

2.      On July 18, 2014, the Utah Division of Securities filed a Criminal Information against Randall alleging 22 counts of securities fraud in connection with his operation of a massive Ponzi scheme for more than ten years through the various companies under his control (Randall and the companies he controlled are collectively referred to herein as "Randall" unless otherwise specified).  All told, the Victims lost more than $29 million by investing in the Ponzi scheme Randall operated under the auspices of a Union Central general agent.

3.      For the most part, the Victims are working people, and many are retirees.  Many are members of the LDS Church, like Randall.  Playing up his position as a respected leader and teacher in the LDS Church, Randall used marketing materials that were designed to appeal to LDS members by focusing heavily on the biblical concept of the "Abundant Life."  Randall's marketing was an explicit attempt to reach out to LDS members. As such, Randall's Ponzi scheme had many of the classic hallmarks of an affinity-based fraud.

4.      Union Central also played a critical role in the proliferation of Randall's scheme. Randall was able to operate his Ponzi scheme for so long because, as a Union Central general agent, he assembled a team of sub-agents that granted him access to a continuous stream of potential victims.  Union Central also cloaked Randall with the imprimatur of legitimacy and respectability that helped him quickly gain the trust and confidence of his Victims.  Most important to Randall, however, was Union Central's willful abdication of its duty to supervise him and willingness to turn a blind eye to the obvious indications of Randall's fraud from the very outset of their relationship.

5.      The red flags of fraud concerning Randall were present even before Union Central hired Randall as its general agent in February 2000.  For example, Randall's previous employer, The Standard Life Insurance Company of New York ("Standard"), had ended its general agency relationship with Randall and put him on a blacklist of agents with whom it would no longer work.  Standard took these actions as a result of Randall's connection with a criminal Ponzi scheme run by his sub-agent, Glen Miller, and the fact that Randall was running substantially the same illegal investment scheme.  Impressed by the sales record Randall had amassed for its competitor, Union Central chose to ignore these facts and hired Randall without performing any

meaningful due diligence.  In doing so, Union Central put each of the Victims at a foreseeable risk of harm.

6.      Randall's Ponzi scheme involved the sale of worthless promissory notes bearing high interest rates that he issued through the various entities that he owned or controlled, but primarily through Horizon Mortgage and Investment ("HMI").  Randall marketed these notes through a pattern and practice of deceit, fraudulent misrepresentations, and misleading omissions.  For example, he claimed that these investments were "guaranteed," were FDIC insured, and were secured, among many other misrepresentations.

7.      Randall used these notes to increase his sales of Union Central insurance and annuity products.  Randall claimed that the "guaranteed" interest payments on the notes would be sufficient to cover the premiums on the expensive, and often unsuitable, insurance policies and annuities that Randall sold on Union Central's behalf.  Randall also claimed that the policy and the note would prop each other up, in effect, so that both would grow "risk-free" without the need for further contributions from the client.  As such, and in addition to violating Utah securities law, by marketing his notes with Union Central's policies, Randall was patently in violation of section R590-154-10 of Utah's Administrative Code, entitled "Prohibited Insurances Sales Tie-Ins," which provides:  "Multi-level programs, investment programs, memberships, or other similar programs, *designed or represented to produce or provide funds to pay all or any part of the cost of insurance constitutes an illegal inducement*."  (Emphasis added.)

8.      Using this illegal sales practice, Randall and HFI quickly became one of Union Central most successful general agencies nationwide.  Because Randall was one of its top-producing agents, Union Central made a conscious choice to ignore the indications that its agent was running a fraudulent investment scheme.  During Randall's tenure as a Union Central

general agent, Union Central collected over *$100 million dollars* in premiums on policies sold by Randall and his sub-agents.

9.      On one occasion, over dinner with two of Randall's highest producing sub-agents, Kevin O'Toole ("O'Toole"), Union Central's Senior Vice President of Distribution with direct supervisory responsibilities over Randall and HFI, stated Union Central's position on Randall's sales practices in no uncertain terms: Union Central did not care how Randall or his sub-agents managed to sell the number of policies they sold, so long as they kept doing it.  After O'Toole praised Randall's Union Central sub-agents for their sales success, particularly their sales of expensive and highly profitable whole life insurance policies, the agents offered to explain how they did it.  Before they could explain, O'Toole stopped them and told them that he did not want to know.  O'Toole's response gave Randall all the assurance he needed to continue perpetrating their fraud without fear of Union Central interference.

10.     Despite O'Toole's deliberate effort to avoid hearing a description of the sales practices employed by Randall and his sub-agents, Union Central knew that Randall was selling promissory notes to Union Central clients and prospects and that he used his notes as a sales tool to illegally induce his Victims into purchasing expensive and often unsuitable Union Central insurance and annuities products.  Indeed, Union Central executives participated in training sessions for Randall's Union Central sub-agents wherein both the notes and this sales technique were discussed at length.

11.     By selling promissory notes issued by his related companies, Randall borrowed literally tens of millions of dollars from his insurance clients, creating profound conflicts of interest that violated Union Central's policies and Utah law.  For over ten years, Union Central ignored this violation of law and policy, to the detriment of the Victims.

12.     Union Central also ignored the fact that Randall was not licensed properly to sell securities or, as of 2002, to even sell insurance.  Even if Randall's sales practices had been proper – and they most certainly were not – he would still have been violating the law and Union Central's stated policies because of his failure to maintain the proper licenses.  It would have been a simple matter for Union Central to verify whether Randall maintained the necessary licenses to sell securities and insurance products, but consistent with its policy when it came to Randall, Union Central deliberately and recklessly looked the other way.

13.     After running his Ponzi scheme for more than ten years, Randall's debt obligations finally began to outpace even his ability to find new clients, and his companies began missing the interest payments due on the notes.  Without the interest payments, many of Randall's Victims could no longer afford the premiums on their Union Central policies and were forced to let them lapse, forfeiting all the benefits the policies might have offered and relieving Union Central of the financial risk associated with them.  Thus, Union Central's association with Randall was filled with financial upside at the expense of the Victims Randall fleeced: Union Central earned millions from expensive policies that ultimately lapsed when the clients could no longer afford to pay the premiums.  The clients, on the other hand, were left with nothing more than unsecured notes in worthless companies.

14.     Given the significant financial benefits Union Central derived from its association with Randall, Union Central stuck with him even after he filed for personal bankruptcy in 2010 and entered into a new general agent agreement with Randall in June 2011.  Even while a chapter 11 trustee was being appointed and HMI was being forced into bankruptcy, Union Central still tried to devise a plan to continue working with Randall by forming a new general agency to replace the bankrupt HMI.  As described by Bob Sumrall, a Union Central executive who

worked extensively with Randall, in an August 30, 2011 email: "Plan is to create new Corporate GA [general agency] with [Randall's] top six producers."  He went on to explain that "Dee Randall, dba Horizon Financial, will go on every application for 10% . . . Dee will still be the point of contact and acting GA. He will provide leadership, set meetings and continue training. His commitment is three years."

15.     Utah law, along with Union Central's internal policies and public statements, required Union Central to supervise its agents.  But despite its obligation to comply with applicable laws and regulations, and its repeated public assurances that it was affirmatively monitoring the sales process of its agents to assure compliance with the law and its own internal policies, Union Central permitted Randall, one of its highest-grossing and highest-profile general agents, to run a Ponzi scheme for over a decade by deliberately and recklessly disregarding its duty to supervise him or his business operations.  By putting its imprimatur on Randall, and turning him loose on the public, freed of any reasonable supervision, Union Central caused millions of dollars in damages to a heart-breaking array of Victims.  Had Union Central exercised the supervision over Randall's sales practices that it was obligated to perform – and which it repeatedly assured clients and the public it was performing – Randall's scheme could never have proliferated so broadly or for so long.

16.     Union Central deliberately and recklessly put each Victim at a foreseeable risk of harm by holding Randall out to the world as a reputable, honest, and ethical Union Central representative despite significant red flags of fraud or impropriety.  For more than a decade, Union Central chose profit over fulfilling its public commitment and legal duty to supervise Randall and his sub-agents.  As a direct and proximate result, Randall's Victims suffered damages in an amount to be proven at trial, but in no event less than $29 million.   By this

complaint, Plaintiff seeks to hold Union Central responsible for its own actions and for the actions of its agents as a control person under Utah Code § 61-1-22.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332 because the parties are citizens of different states.

18.     This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1334(b) because it is related to Dee Randall's and the Horizon Group's bankruptcy cases.

19.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

### A.  Plaintiff

20.     Plaintiff Gil A. Miller is a citizen of the State of Utah and the duly authorized and appointed Private Actions Trustee of the Randall Victims Private Actions Trust that was created and authorized by the Plan.  The Victims PAT was created pursuant to the Plan in Chapter 11, No. 10-37546, pending before the honorable Judge Joel T. Marker in the United State Bankruptcy Court in the District of Utah (the "Bankruptcy Court").   In January of 2012, Randall's personal estate and bankruptcy case was substantively consolidated with the estates of Randall's investment and insurance companies, Horizon Auto Funding, LLC, Independent Commercial Lending, LLC, Horizon Financial Center I, LLC, Horizon Mortgage and Investment, Inc., and Horizon Financial and Insurance Group Inc.

21.     On October 28, 2013, the Bankruptcy Court entered the *Order Confirming the Chapter 11 Trustee's Liquidating Plan of Reorganization Dated September 9, 2013,* which confirmed the Plan and authorized the creation of the Victims PAT.  The Plan permitted certain investors with losses from Randall's scheme, defined by the Plan as Class 17 Victims, to assign

their causes of action against "Facilitators" of the scheme to the Victims PAT either in connection with voting on the Plan, or subsequent to the creation of the Victims PAT.[1]

22.     The Plan and the associated Randall Victims Private Actions Trust Agreement provides for Plaintiff, Gil A. Miller, to serve as the trustee of the Victims PAT (Mr. Miller, in such capacity, "Trustee" or "Plaintiff").  Sections 1.4(b) and 3.8(j) grant Mr. Miller, as Trustee, "the absolute right to pursue, settle and compromise . . . any and all Victim Causes of Action" in favor of the Victims PAT.

### B.  Defendants

23.     Defendant Union Central Life Insurance Company is an insurance company chartered in the State of Ohio, with its principal place of business in Lincoln, Nebraska.  Union Central is licensed by the Utah Insurance Department to sell insurance products to Utah residents.

24.     In January 2006, Union Central merged with The Ameritas Acacia Companies ("Ameritas"), further expanding its geographic reach, sales force, and the array of products and services it provides, and established UNIFI Mutual Holding Company ("UNIFI").  UNIFI is the holding company of several entities that provide various insurance and financial products and services, including Union Central.

25.     Defendant Ameritas Life Insurance Corp. is an insurance company chartered in the State of Nebraska, with its principal place of business in Lincoln, Nebraska.

---

[1] The Disclosure Statement accompanying the Plan defines "Facilitators" as Union Central (which includes Ameritas Life Insurance Company, Ameritas Mutual Holding Company and Affiliates of the foregoing, such as Ameritas Life Insurance Corp., Ameritas Life Insurance Corp. of New York, and Acacia Life Insurance Company) and others who assisted, facilitated, or perpetuated the operations of the [Randall] Ponzi scheme.

26.     Defendant Ameritas Life Insurance Corp. of New York (f/k/a First Ameritas Life Insurance Corp of New York) is an insurance company chartered in the State of New York, with its principal place of business at 1350 Broadway, Suite 2201, New York, New York 10018-7702.

27.     Defendant Acacia Life Insurance Company is an insurance company chartered in the District of Columbia, with its principal place of business in Lincoln, Nebraska.

**C.  Relevant Third Parties/Ponzi Scheme Entities**

28.     **Dee Allen Randall**:  Dee Allen Randall, a Utah resident with an address at 1376 Golden Circle, Fruit Heights, Utah, was the primary architect and promoter of the Ponzi scheme that caused the Victims over $29 million in damages.  Randall was a licensed broker-dealer agent with the Utah Division of Securities from 1987 until 1997 but failed to maintain his license after 1997.  In 2000, Randall became a general agent for Union Central.  He held that position until he was terminated in November 2011.

29.     Randall filed a personal bankruptcy petition on December 20, 2010 in the United States Bankruptcy Court for the District of Utah.  Prior to his bankruptcy filing and for a period thereafter, Randall perpetrated his Ponzi scheme through various companies he owned, including Horizon Financial and Insurance Agency, Inc., Horizon Mortgage and Investment, Inc., Horizon Auto Funding, LLC, Horizon Financial Center I, LLC, and other entities.

30.     **Horizon Financial and Insurance Agency Inc.** ("HFI"):  Randall was the owner, president, and director of HFI, a Utah corporation.  Union Central contracted with Randall on February 28, 2000, to serve as Union Central's general agent in Utah, and Randall used HFI as the business entity through which the general agency functioned.  Randall remained a Union Central general agent until November 9, 2011, when Union Central, without notice to Plaintiff or permission from the Bankruptcy Court, unilaterally terminated the agency.  After

Plaintiff was appointed as Trustee over Randall's bankruptcy estate, he caused HFI to file a bankruptcy petition on October 12, 2011.

31.     **Horizon Mortgage & Investment, Inc.** (a/k/a Independent Financial & Investment, "HMI"):   Randall was the owner, president, and director of HMI, a Utah corporation.   HMI was invested in various real estate projects around Utah, as well as used automobile financing, and debt consolidation.   Randall used HMI to raise millions of dollars by issuing promissory notes over the course of a decade through Randall and other agents/producers of Union Central.   After Plaintiff was appointed over Randall's bankruptcy estate, he caused HMI to file a bankruptcy petition on October 12, 2011.

32.     **Horizon Auto Funding, LLC.** ("Horizon Auto"):   Randall was the owner, president, and director of Horizon Auto, a Utah limited liability company.   Horizon Auto made used car loans.   Randall used Horizon Auto to raise millions of dollars by issuing promissory notes through Randall and other agents/producers for Union Central.   After Plaintiff was appointed over Randall's bankruptcy estate, he caused Horizon Auto to file a bankruptcy petition on October 12, 2011.

33.     The other investment companies that Randall either owned or controlled include: Independent Commercial Lending, LLC; Fruit Heights Construction and Management, LLC ("Fruit Heights"); Strategic Commercial Lending, LLC; Castle Holding and Operating, LLC; Horizon Financial Center I, LLC ("HFC"); Marine Credit Systems, LLC. (collectively, with HMI, HFI, and Horizon Auto, the "Horizon Group").

## FACTUAL BACKGROUND

I.    **Overview of Union Central's Relationship with Dee Randall and the Horizon Group**

    **A. The general agent contract that governed Union Central and Randall's relationship granted Union Central broad powers to supervise and control Randall and his operations.**

34.     Union Central is a life insurance company that sells an array of insurance and financial products, including life and disability insurance and annuities, through a network of general agents.   Union Central's general agents are responsible for, among other things, representing Union Central in the sale of its insurance and annuity products.   Union Central retained Randall, through his agency, HFI, as its general agent for the state of Utah from February 28, 2000, until November 9, 2011, pursuant to the terms of Union Central's general agent contract ("GA Contract").

35.     Union Central encourages its general agents, like Randall, to recruit sub-agents, or "producers," to expand its sales force.   Although the sub-agents must be associated with a general agent, each sub-agent is required to enter into an agency agreement directly with Union Central.   The general agents and sub-agents cultivate and maintain relationships with Union Central's policyholders and prospective clients.   Because they serve as the primary point of contact with clients, agents and sub-agents are the public face of Union Central.

36.     Union Central pays general agents and sub-agents commissions based upon the premiums of the insurance and financial products they sell.   General agents receive a commission on their own sales, as well as on the sales of their sub-agents.   The commission compensation system creates an obvious tension and potential conflict between the financial best interests of a client versus an agent or sub-agent.   Strictly from the perspective of compensation, Union Central's agents are incentivized to sell policies and annuities that have the highest premiums even if those may not be the products best suited for their clients' needs and

circumstances.  Thus, it is critically important that Union Central not only establish proper sales and marketing standards and procedures, but also take appropriate steps to implement and enforce them.

37.     At all times relevant to this Complaint, Union Central's policies regarding the sales and marketing practices of its agents were set forth in its market conduct guide (the "Market Conduct Guide").  Similarly, Union Central's GA Contract sets forth the duties and obligations of its general agents, including Randall and HFI, and gave Union Central the necessary control over them to enforce compliance with the standards and procedures set forth in the Market Conduct Guide as well as applicable insurance laws and regulations.

38.     Randall's and HFI's duties under the GA Contract included soliciting applications for Union Central's policies, proper record keeping, maintaining proper licensing, and abiding by "all laws and regulations governing the sale and solicitation of insurance."  Union Central could withhold Randall's compensation to enforce compliance with the GA Contract and Union Central's policies and procedures.  Union Central could also suspend the payment of any compensation due under the agreement until Randall came into compliance with Union Central's policies, including its policies related to the use of the Union Central name and trademarks.

39.     The GA Contract also gave Union Central other broad rights to supervise and control Randall.  For instance, Union Central reserved the right to reject policy applications, limit the amount or type of policies offered, require higher premiums than applied for, withdraw or alter existing policy forms, and, at its discretion, introduce new policies or procedures for Randall and HFI to follow.  Moreover, Union Central also had the right to audit HFI's books, records, and accounts of business to ensure Randall was performing his duties under the agreement consistent with Union Central's standards and procedures.

40.     Furthermore, Union Central had substantial control over who Randall could hire as a sub-agent.  Randall could request the appointment of sub-agents to work for HFI, but Union Central had the final say on whether to appoint them.  If Union Central agreed to appoint a sub-agent requested by Randall, Union Central required the sub-agent to enter into a written agency contract directly with Union Central before the sub-agent was permitted to solicit applications for Union Central policies.

41.     Union Central also had the right to terminate the GA Contract for cause if Randall committed any fraud against Union Central's policyholders or otherwise failed to comply with the terms of the agreement.  As detailed below, despite these broad powers to control Randall, Union Central knowingly and recklessly permitted him to violate the standards and procedures set forth in the Market Conduct Guide with impunity, and the foreseeable financial devastation of Randall's Victims resulted.

**B. Union Central assured its potential and actual clients that it exercised supervisory oversight over its agents, like Randall and HFI.**

42.     Because earning and maintaining the trust and confidence of its clients is critical to Union Central's business, Union Central aggressively promotes itself to the public as a company that holds its agents to the highest standards of honesty, fairness, and integrity.

43.     For example, since at least 2001, Union Central's website has promised its clients and potential clients that, "[t]he truth will be central to all of our communications with each other," and has touted its membership in the Insurance Marketplace Standards Association ("ISMA").  IMSA is a group that was formed by insurance industry leaders "in response to a

crisis of damaged consumer trust and confidence in the insurance industry."  IMSA's mission is to promote and ensure ethical conduct in the sale of life insurance and annuity products.[2]

44.     As Union Central stated on its website, "[w]hen we joined the IMSA we agreed to set up and follow procedures specifically designed to promote ethical market conduct."  Union Central further explained that, as a member of IMSA, it was required to take affirmative steps to ensure ethical conduct in the sale of its policies, including monitoring the sales process carefully and on a regular basis.  In addition, Union Central was required to emphasize to all of its employees and distributors the concepts of ethical market conduct through an ongoing communications program.

45.     Union Central was explicit in its public representations about top-producers like Randall, saying that its top performing agents personified the "highest standards of performance, integrity, client service, and professionalism."   Thus, Union Central expressly invited the public to put its trust in Randall as a person who met the "highest standard" of "integrity."

46.     Beginning in at least 2001, Union Central's website and marketing materials consistently invited potential clients and clients to rely upon what Union Central's agents and sub-agents told them with such statements as:

- "The truth will be central to all of our communication with one another."

- "[W]e are committed to: Helping you make informed decisions; . . . [and] [e]nsuring the proper training for our field associates and employees."

- "Ethical market conduct practices have always been an integral part of our mission statement and business practices."

---

[2] The IMSA was superseded by the Compliance & Ethics Forum for Life Insurers in 2010 ("CEFLI").  Upon information and belief, Union Central is also member of CEFLI.

47.     These representations were factual in nature.  They were not puffery or statements of opinion, but rather, they were factual statements by Union Central about its business practices and its agents that Union Central made for the purpose of fostering trust between its agents and its clients and potential clients – a trust that Union Central breached by deliberately and recklessly ignoring numerous red flags of Randall's fraud and permitting Randall to operate his Ponzi scheme unabated for over a decade as a Union Central general agent.

II.     UNION CENTRAL HIRED RANDALL DESPITE RED FLAGS THAT HE HAD ALREADY BEEN INVOLVED IN ONE PONZI SCHEME AND WAS RUNNING ANOTHER.

48.     Randall began operating his Ponzi scheme during the mid-1990s while he was a general agent for Standard, several years before he began representing Union Central.

49.     Shortly after becoming Standard's general agent, Randall founded HFI and recruited a small team of sales agents.  Around the same time, Randall also founded HMI and began offering his agency's insurance clients and prospective clients the opportunity to invest in HMI by purchasing promissory notes.

50.     Randall soon discovered that he could sell more expensive insurance policies, and a greater number of policies overall, by advising his clients to pair the purchase of an insurance policy with the purchase of a promissory note, the return on which would purportedly fund the insurance premiums.  In this way, Randall not only got access to the client's cash to use for his investment company, but he also earned higher commissions on his insurance sales in the process.  This sales practice, however, is expressly prohibited by Utah Administrative Code R590-154-10, entitled, "Prohibited Insurances Sales Tie-Ins."  This section provides:  "Multi-level programs, investment programs, memberships, or other similar programs, *designed or represented to produce or provide funds to pay all or any part of the cost of insurance constitutes an illegal inducement*."  (Emphasis added.)

16

51.     In 1996, Randall recruited Glen Miller, an experienced life insurance agent, to work with his agency and solicit policies for Standard.  When Miller joined HFI, he was running essentially the same scam as Randall – selling high-interest bearing promissory notes issued by an investment company he owned, LD&B, to cover the premiums on insurance policies that his clients could not otherwise afford.

52.     Using this scheme, Miller quickly became Randall's most successful sales agent. With Miller's help, Randall grew HFI into Standard's most successful agency nationwide, producing almost $1 million in annual premiums in 1998 and 1999.  After he moved to Union Central, Randall essentially went from student to master, employing the same scheme as Miller with even greater results.

53.     Randall's relationship with Standard began to deteriorate in 1999 when the SEC exposed LD&B, Miller's investment company, as a Ponzi scheme.  In May 1999, the SEC filed a complaint against Miller in connection with its ongoing investigation of LD&B.  By late 1999, Standard started receiving demand letters from HFI clients who had invested in LD&B and claimed they had been defrauded by Miller and Randall.  In the course of settling these demands, Standard learned about allegations that Randall had been selling HMI promissory notes to Standard policyholders and prospects in very much the same manner as Miller had been selling his notes.  Standard demanded that Randall provide the names of each Standard policyholder that had invested with Randall, and threatened to report Randall's activities to the SEC if he refused.

54.     The allegations against Randall were true.  Randall was selling notes from his investment company to Standard clients.  By the time Standard requested his investor list, Randall had raised over $7.3 million for HMI with the majority coming from Standard policyholders.  Like LD&B, HMI was already a complete failure as an investment company.  By

17

at least 1998, HMI had also become a Ponzi scheme, only staying afloat by cash inflows from new investors.

55. Standard's demand left Randall with few options. Disclosing his investor list would constitute an admission that he was violating Standard's directives against comingling Standard policies with the sale of promissory notes and selling an investment product to Standard customers that Standard had not previously approved. But, if he refused, his scheme would eventually be exposed by the SEC. Either way, Randall would lose his agency contract with Standard, which would not only halt Randall's commission income, but would also put an end to the steady access to prospective clients he needed to perpetuate his fraud.

56. By January 2000, Randall began receiving demand letters from LD&B investors. With no way to salvage his relationship with Standard and multiple investor lawsuits and an SEC investigation on the horizon, Randall began searching for another insurance company to represent as its general agent in Utah.

57. Randall and HFI would have appeared, on the surface, to be an attractive proposition to insurers looking to expand into Utah. Randall and HFI had amassed an impressive record of financial success while representing Standard, consistently generating new clients and premiums. But Randall needed an insurance company that was willing to ignore his association with Glen Miller's exposed fraud and his own investment scam. Randall found what he was looking for in Union Central.

58. Randall submitted an application to Union Central on February 15, 2000. Union Central invited Randall and his son, Matt Randall, also an HFI agent, in for an interview. The interview focused almost exclusively on the size and performance of HFI and assessing whether Randall's success could continue under Union Central. Based upon Randall's and his sub-

agents' sales performance for Standard, and given the fact that it had no presence in Utah, Union Central was eager to hire Randall.

59.     As a result, Union Central expended little to no effort investigating why Randall was losing his contract with Standard, or why Miller no longer worked with HMI.  When asked why Randall no longer had a contract with Standard, Matt Randall explained vaguely that Standard was not "happy with one of [Randall's] agents," Glen Miller.  According to Matt Randall, Union Central also knew that Miller was one of Randall's top agents and that he no longer worked with HFI.  Thus, on its face, Matt Randall's explanation made little sense. Nevertheless, Union Central did not ask any follow-up questions about the nature of the problems associated with Miller, only whether Randall's success could continue without him.

60.     Matt Randall's "explanation" constituted a significant red flag that would cause any reasonable insurer to investigate further before hiring Randall.  At a minimum, a call should have been placed to the former insurance company to solicit a reference.  But Union Central did no such investigation.  In fact, according to Matt Randall, Union Central's response to his vague explanation of the reason for leaving Standard was a reassuring indication that Union Central would be willing to adopt a hands-off, no-supervision-needed, approach to Randall's operation: "Where do we sign?  Let's get you going."

61.     Union Central could have asked Standard for a letter of reference or to provide a copy of Randall's employment record, but it did neither.  On his agent/agency application, Randall authorized Union Central to obtain from Standard any information it possessed about his dealings and performance with Standard, including all business production reports, compensation, premiums written, and business methods or practices.  Even though Union Central required Randall to execute a form authorizing and requesting his employment record

from Standard, Union Central did not take even this simple step to vet Randall before engaging him as a general agent.  Union Central acted unreasonably, under the circumstances, in failing to take this basic precaution.

62.     If Union Central had sought a reference from Standard, it would have discovered, at a minimum, that Randall had been placed on Standard's "Blacklist," a written list of agents with whom Standard refused to do business.  Such an action by a former employer would have put a reasonable employer on notice that further investigation was required before hiring Randall.

63.     Randall also authorized Union Central to obtain an investigative consumer report to "provide applicable information concerning character, general reputation, financial outlook, personal characteristics, and mode of living."  Union Central did obtain a consumer report on Randall but only searched for the most basic information regarding Randall's professional record, criminal record, and employment verification.

64.     Had Union Central acted reasonably under the circumstances, it would have discovered that (i) Randall's agent, Miller, operated a Ponzi scheme while working for HFI; (ii) the SEC was investing Miller's Ponzi scheme and had already initiated an action; (iii) Randall had been operating substantially the same scheme for several years while acting as Standard's general agent; and (iv) Randall was in the midst of several investor lawsuits as a result of Miller's fraud.  As such, Randall posed a foreseeable risk of harm to Union Central's customers and its prospective customers.  Nevertheless, as would become its overriding policy with Randall, Union Central looked the other way and retained Randall and HFI as its general agent for Utah.

**III.    RANDALL CONTINUED TO OPERATE HIS PONZI SCHEME FOR OVER A DECADE AS UNION CENTRAL'S GENERAL AGENT.**

**A.  The Horizon Group was a Ponzi scheme and the Horizon Notes were worthless.**

65.    Randall continued to operate the Horizon Group as a Ponzi scheme during the entire time he served as Union Central's general agent, defrauding hundreds of Victims out of more than $29 million.  Randall's Ponzi scheme revolved around the sale of promissory notes (the "Horizon Notes") issued by the Horizon Group entities, which Randall owned and controlled.

66.    Randall purportedly founded each company in the Horizon Group as an investment company with a specific business purpose.  The Horizon Group's purported business model was to raise capital through the issuance and sale of short-term high interest-bearing promissory notes and then to invest the capital in accordance with the business purpose of the issuing entity: *e.g.*, auto loans or real estate development.  That was the pitch.  The reality was quite different.

67.    Randall ran the Horizon Group as a single enterprise and comingled the funds of the various entities.  For example, Randall routinely transferred funds raised by one entity, including HFI, to pay the debts of others.  Worse, Randall used the money raised from the sale of Horizon Notes as his own personal funds.  In fact, he did not even maintain a personal bank account during at least some portion of the time relevant to this Complaint.  Instead, he used the bank accounts of the Horizon Group entities for his personal expenses.

68.    Although the Horizon Notes had two to three-year maturities and stated interest rates of between nine and one-half and eighteen percent (9.5%–18%), the notes were essentially worthless.  The Horizon Group was a complete failure and never generated sufficient cash flow from its investments to service the interest due on the Horizon Notes.  Rather, Randall used the

proceeds from the issuance of new Horizon Notes to pay the interest due on the outstanding notes and the principal on maturing notes.  Randall, therefore, had to continually raise new funds from investors to cover the principal on the maturing notes and to make the ever-increasing monthly interest payments due to current investors.  With each new investment Randall took in, the Horizon Group went deeper into debt.  In other words, the Horizon Group was a classic Ponzi scheme.

**B. Randall sold the Horizon Notes, and concealed his fraud, through deceit, misrepresentations, and misleading omissions.**

69.     To sell the Horizon Notes, convince investors to roll their investment into new notes, and to keep unpaid investors from looking too closely at his operations while he searched for new Victims, Randall relied on fraudulent misrepresentations and omissions.

70.     Randall had private placement memoranda (the "Horizon PPMs"), audited financial statements, and associated subscription agreements (together, the "Subscription Materials") prepared for the Horizon Group companies that offered notes.  The Horizon PPMs contained statements that the money raised through the issuance of the Horizon Notes would be used, in part, to make interest and principal payments to old investors.  But, because the Horizon Group was a Ponzi scheme, this disclosure does not change the fact that Randall's scheme constituted an act or practice or course of business which operated as a fraud or deceit upon investors.

71.     In any event, most of Randall's Victims either never received Subscription Materials or received them only long after making an investment.  Indeed, Randall's practice was to withhold critical portions of the Subscription Materials from his Victims until after they had purchased a Horizon Note.

72.     To the extent that Victims did receive portions of the Horizon PPMs, the documents would have been of little use because they contained numerous false representations and material omissions.  For example, the Horizon PPMs falsely state that no commission was paid in connection with the offering of the Horizon Notes.  In reality, HFI – whose unaudited books were kept by Randall's daughter – paid a cash commission or "finder's fee" to Randall's Union Central sub-agents each time their clients purchased a Horizon Note.  Thus, the PPMs concealed the fact that Randall, as Union Central's general agent for the entire state of Utah, was paying commissions to his network of Union Central sub-agents to incentivize them to continue funneling Victims into his fraudulent scheme.

73.     The Horizon PPMs also omitted many material facts about Randall and the nature of the "investment," including the facts that:  (i) Randall and his wife had previously filed for personal bankruptcy; (ii) HMI's failure to make interest payments on the Horizon Notes could result in the Victim's insurance policies, purchased in conjunction with the note, to lapse; and (iii) HMI and HFI (and other entities in the Horizon Group) regularly commingled funds and Randall used such funds to pay his personal expenses.

74.     In marketing the Horizon Notes, Randall and his sub-agents' practice was to use some combination of the following misrepresentations, among others:

    a.  Investments in Horizon Auto were secured by car titles, or the automobiles themselves, which could be repossessed to ensure that their investment was protected;

    b.  The Horizon Notes were secured by Randall's personal life insurance policy;

    c.  The Horizon Notes were secured by real estate;

    d.  The value of the real estate held by the Horizon Group far exceeded the companies' liabilities;

e.   Investments were "guaranteed" or collateralized by a specific real estate project;

f.   The investor would not lose their money;

g.   Investor funds would be used for a specific project, such as auto loans or real estate construction;

h.   The investment was "safer than the stock market";

i.   The investment was "as secure as anything out there";

j.   The investment was "FDIC insured";

k.   The investment involved no risk, and could only fail "if the whole country went down";

l.   The investment would be "no fail" and there was plenty of "insurance to cover loss";

m.   After funds were raised to pay off a certain balloon payment, the investment would be "cash-flow heaven";

n.   Randall always had at least $1 million in the bank that he could use as a slush fund; and

o.   Randall had never declared bankruptcy and was not running a Ponzi scheme.

75.     Each of these representations was false.  In reality, the Horizon Notes were not secured or guaranteed, and were often subordinated to the Horizon Group's bank debt.  The value of the Horizon Group's real estate assets never exceeded its liabilities and, given that the Horizon Group was a Ponzi scheme, the investors would likely lose their investments.

76.     When the Horizon Group entities failed to make payments on the notes, Randall similarly had a practice of making a handful of additional misrepresentations to the Victims to conceal his fraud.  For example, Randall would tell them that HMI's real estate projects were running behind development schedule, but that he had appraisals showing that the value of the properties was sufficient to pay off all of HMI's debts.  Randall would also point to his personal

life insurance policy, and tell his Victims that it was worth millions and that he could use it to pay off the debts, if necessary.  In other instances, Randall would tell his Victims that HFI was guaranteeing the debts of the other entities in the Horizon Group, and that HFI had a secure income stream from insurance renewal commissions.  These representations, too, were false.

### C. Union Central's relationship with Randall played a key role in the proliferation his Ponzi scheme.

77.     Randall used his general agency relationship with Union Central to perpetrate and extend the life of his fraud in a number of ways.  For example, Union Central provided Randall with the ability to assemble a large sales force that granted him access to a continuous stream of potential victims.  Union Central also gave him the appearance of respectability and legitimacy which he and his sub-agents leveraged to gain the trust and confidence of the Victims.  Without Union Central's continuous backing, support, and willingness to ignore Randall's fraudulent activities, Randall's Ponzi scheme would have collapsed years earlier.

78.     For his scheme to work, Randall needed to be cloaked with the imprimatur of respectability and credibility that came with being the general agent of a respected insurance company.  Furthermore, the insurance company needed to be willing to overlook the red flags of his fraud and, unlike Standard, accept its cut of the profits without asking too many questions. Union Central was happy to play its part.

79.     Randall also needed access to large number of potential victims and a sales force to generate leads and sell his notes.  Union Central helped with that as well.  As Union Central's general agent for the State of Utah, Randall was able to build a team of up to 80 sub-agents, each of whom signed individual agent agreements with Union Central and reported to Randall. Randall's Union Central sub-agents met regularly with Union Central clients and prospective clients interested in life insurance products, and used these meetings to generate "leads" or

"targets" for Randall.  Thereafter Randall would meet with the leads personally, either in their homes or, more often, in the Horizon Group offices where Randall conducted business as a Union Central general agent.

80.     Randall's Union Central sub-agents would also often pitch and sell the Horizon Notes directly to their clients and prospects as part of their overall insurance sales-pitch. Whether they sold the notes themselves or passed the target on to Randall to close the deal, Randall paid them a commission on every Horizon Note they participated in selling.

81.     In marketing the Horizon Notes, Randall and his Union Central sub-agents leveraged the credibility and respectability of being associated with Union Central and Randall's respected position as a leader and teacher within his LDS community to prey on members of the LDS Church.

82.     Randall had strong connections in his LDS community, which he freely exploited to lull his Victims into trusting and depending upon him.  As a High Priest and counselor in his LDS congregation's bishopric, Randall was one of three men that led and presided over his ward. The members of his congregation also recognized him as an excellent Sunday school teacher and person dedicated to the faith and LDS teachings.   Among other things, Randall worked in the LDS Temple in Bountiful, Utah, and as a LDS "Inner City Missionary."

83.     Randall used his LDS connections and standing in the community as a platform from which to market and sell Union Central insurance and the Horizon Notes to his Victims. For instance, Randall hosted an annual marketing event to which he invited over 1,000 people from his community and at which Union Central played a critical role.

84.     During at least the 2006–08 time frame, Randall held his annual marketing event at the ballroom in the Grand America Hotel in Salt Lake City.  The event's central theme, like

Randall's marketing materials, including his monthly newsletter, was the biblical concept of the "Abundant Life."  Randall served the finest foods to his targets (*i.e.*, friends, neighbors, and the members of his community), invited affluent members of the local community to speak, and spent tens of thousands of dollars on guest speakers.  To ensure that each of his targets received personal attention, Randall interspersed his sub-agents, who used the events to expand their sales of Union Central's insurance products and to market the Horizon Notes to the attendees.

85.    At one event, Larry Miller, the owner of the Utah Jazz, introduced David McCullough, the noted historical author, as the keynote speaker who spoke to the roomful of clients and prospective clients assembled by Randall.   Another year, Frank Abagnale, the autobiographical author of <u>Catch Me If You Can</u>, spoke at Randall's event.  Abagnale, who, ironically, was a prolific conman himself, delighted the crowd with stories about his colorful background.

86.    For Randall, however, the most important speaker at both of these events, and upon information and belief several others, was the President of Union Central, who was there to publicly laud Randall, the Horizon Group, and his Union Central sub-agents with praise.  And, at least one year, Union Central's president presented Randall with an award.  In doing so, he spoke to a roomful of Randall's targets at length about Randall's accomplishments and touted Randall's business success.  He also had all of Randall's Union Central sub-agents in the room stand up to applaud them for the work they had done to help people plan for their futures.  In doing so, Union Central's president further reinforced Randall's theme by referring to them as "Abundant Life representatives."   Thus, Union Central reinforced Randall's image of respectability and credibility, and the legitimacy of his entire organization, directly to members of Randall's community, many of whom ultimately invested in his Ponzi scheme.

**D. Randall used the Horizon Notes to sell Union Central insurance products and Union Central Insurance products to sell Horizon Notes.**

87.     In addition to receiving Union Central's public stamp of approval, Union Central's insurance products also played a central role in the sales pitch for the Horizon Notes. Similarly, Randall used the Horizon Notes as a tool to sell insurance.  Indeed, as alleged by the Utah Division of Securities, Randall created the Horizon Group entities "to increase his insurance sales for his agency, HFI."

88.     Randall described himself and his Union Central sub-agents to his targets as "professional financial advisors."  To reinforce a target's trust and confidence in their skill as financial advisors and planners, Randall and his Union Central sub-agents would use worksheets and financial modeling programs to perform seemingly complex financial analyses to produce a purportedly sound financial plan for the target.  Invariably, however, the financial plan Randall and his Union Central sub-agents produced and recommended included an expensive Union Central insurance policy or annuity bundled with an investment in the Horizon Group.

89.     Randall and his Union Central sub-agents primarily relied upon the LEAP system to sell both the Horizon Notes and expensive Union Central insurance policies.  The LEAP program was designed by LEAP Systems, LLC, a New Jersey company that sells and licenses software and other material that purports to assist individuals develop strategies to maximize their economic growth.

90.     Randall and his Union Central sub-agents, however, used the LEAP materials as promotional tools to convince relatively unsophisticated clients to make aggressive investments in expensive whole life insurance policies and annuities.  Randall seized upon LEAP's core concept of integrating financial assets to produce more efficient growth (*e.g.*, paying for life insurance policies with the interest earned from other investments) as ideal for both promoting

the Horizon Notes and selling higher-value insurance policies.  Randall also relied upon LEAP's materials to advise his clients to borrow against the cash value of their insurance policies to raise money to invest in the Horizon Notes.

91.     When pitching both the Horizon Notes and Union Central's insurance products, Randall and/or his Union Central sub-agents would extol the benefits of an expensive insurance product without regard to whether the policy or annuity actually suited the needs and financial circumstances of the target.  (They often pushed expensive whole life policies with a large death benefit or annuities with high payment streams that would eventually accrue a substantial cash surrender value.)  The high premiums of these types of policies earned Randall and the sub-agents hefty commissions from Union Central.  They also generated substantial revenues and profits for Union Central.

92.     The policies and annuities that Randall and his sub-agents pitched in this manner were often unsuitable for the client because they were too expensive, among other things.  But Randall purported to offer a solution.  He would advise his targets to invest in a Horizon Group entity by purchasing a Horizon Note.  Randall represented that the interest income from the note would cover the cost of the policy premiums.  Thus, if the two products were bundled together, Randall claimed, they would prop each other up and grow without the need for further contributions.

93.     If the target did not have the liquidity to purchase a Horizon Note of sufficient value to generate the interest necessary to cover the premiums of their desired (but unsuitable) insurance or annuity product, Randall would advise them to roll over their retirement accounts, borrow against the cash value of the their insurance policies, take out home equity loans, or tap inheritances to put every dollar available towards buying the Horizon Notes.

94.     As a result of Randall's fraudulent misrepresentations regarding the Horizon Notes, many of his targets wanted to purchase a note without purchasing insurance.  Under such circumstances, Randall or his Union Central sub-agents would sell them a Horizon Note first and revisit the insurance portion of their pitch at a later date.  After the client began receiving interest payments, Randall or the Union Central sub-agent would use the LEAP model again to try to convince them to invest the interest payments they were receiving on the note to pay the premiums on an expensive insurance policy.

95.     Thus, Randall and his Union Central sub-agents were "illegal[ly] induc[ing]" their clients to purchase insurance in violation of Utah Administrative Code section R590-154-10.  As such, the premiums that Union Central received on the sale of its policies can be fairly characterized as Union Central's share of Randall's fraudulent scheme.  Even when a Victim purchased a Horizon Note without purchasing insurance, such sales can be attributed to the improper symbiotic relationship between Union Central and Randall.  Randall leveraged Union Central's reputation of respectability and trustworthiness when he sold the Horizon Notes.  Union Central facilitated this by making him a general agent, publicly supporting him, permitting him to use its name and tout his association with a national insurance company, and by holding him out as a model agent.

96.     As described below, Union Central representatives witnessed first-hand how Randall and his Union Central sub-agents were marketing and selling Union Central insurance and annuity products with the LEAP system. Union Central, however, expressed no concern about these sales and marketing practices and, in fact, praised Randall's use of LEAP and encouraged other general agents to adopt the system.   In contrast, LEAP Systems, LLC expressed serious concern upon learning that Randall and his Union Central sub-agents were

advising their clients to borrow against the cash values of their life insurance policies to fund investments in the Horizon Notes.  In his letter requesting that HFI refrain from using LEAP to give such advice, Robert M. Ball, president of LEAP Systems, made it clear that "LEAP does not endorse, support, or recommend that Licensees of the LEAP SYSTEM use any concept whereby cash values are borrowed on a systematic basis."

### E. Union Central reaped significant financial rewards from Randall's Ponzi scheme.

97.     Union Central was willing to ignore Randall's and his Union Central sub-agents use of improper and illegal sales practices because there was good money in it.  By using his fraudulent investment scheme to sell insurance, Randall and HFI quickly became one of Union Central's most profitable agencies in the country.  Eventually, HFI boasted over 4,000 clients and 80 active agents and was one of Union Central's top-twenty producing agencies several years in a row.

98.     Union Central rewarded Randall's success by featuring Randall and HFI prominently in its publications and on its website, showcasing him as a model for other general agents, and lending him even more credibility.  Among other things, being made a "poster boy" for Union Central only increased Randall's ability to market himself to more and more clients. In 2005, Union Central awarded Randall and HFI the Crystal Trophy for being its top producing agency nationwide.  Union Central publicly welcomed Randall into the "$500,000 Club" and gave him a trophy in recognition of his sales achievements.  Union Central even put Randall's picture in the 2005 annual report that it sent to every one of its policyholders.

99.     Moreover, Union Central earned tens of millions of dollars in premiums based upon Randall's and his sub-agents' sales efforts.  Union Central earned over $97 million in premiums from 2005 through 2012 from policies sold in the state of Utah.  And by 2006, Union

Central had become one of Utah's top 20 providers of life insurance by market share based largely upon Randall's efforts.

100.    Randall achieved his runaway sales success through fraud and rampant violations of Union Central's standards and procedures and applicable law.  Instead of doing anything to supervise Randall or enforce its policies for over a decade, Union Central continued to look the other way while it reaped the financial benefits of Randall's fraud.

## IV.    UNION CENTRAL DELIBERATELY AND RECKLESSLY FAILED TO SUPERVISE RANDALL.

### A.  Union Central had actual knowledge or was willfully blind to the "secret" of Randall's, and its own, success in Utah.

101.    Blinded by greed, Union Central willfully ignored numerous red flags of Randall's fraud over the course of more than a decade.  Indeed, Union Central made its policy of deliberate ignorance explicit very early in its relationship with Randall and HFI.

102.    After just a couple of years as a Union Central general agent, Randall had become one of Union Central's top selling general agencies nationwide.  Randall's success was built largely upon his disproportionate sales volume of whole life insurance policies which generate large premiums and which are extremely profitable for the insurer.

103.    As an incentive to its agents and agencies, Union Central invited its top producers to luxury vacations at exotic locations around the world.  At one such event, Kevin O'Toole, the Union Central executive with direct supervisory responsibility over Randall and HFI, joined two of Randall's top-producing Union Central sub-agents for dinner.  Over dinner, O'Toole marveled at the high proportion of whole life insurance policies Randall and his Union Central sub-agents managed to sell.  The sub-agents, Les McGuire and Ray Hooper, were eager to tell O'Toole how they do it.  As they began to explain their sales process and how they used the Horizon Notes in their sales pitches, O'Toole quickly cut them off, holding his hands up as if to physically block

the information they were about to tell him.  He then made Union Central's policy on such matters clear:  he did not want to know how they did it, but encouraged them to keep it up.

104.    Despite O'Toole's deliberate refusal to listen to how Randall and HFI had become such a quick success, Union Central could not avoid actual knowledge that Randall and his Union Central sub-agents routinely violated Utah insurance regulations and securities law. Moreover, given that Randall's marketing and sale of Union Central's insurance and annuity products and the Horizon Notes violated virtually every page of Union Central's Market Conduct Guide, Union Central knew or should have known about the numerous obvious indicators of Randall's fraudulent activities.

> 1.  *Union Central knew, and ignored, that Randall was marketing and selling the Horizon Notes to its clients and prospects in violation of applicable securities law.*

105.    HFI maintained an open-door policy with Union Central and Randall did not conceal his sales tactics and business activities from Union Central, including the fact that his Union Central sub-agents were referring Union Central customers to Randall to invest in the Horizon Notes.  Indeed, Matt Randall has testified that HFI was an "open book" when it came to Union Central.

106.    Union Central's representatives regularly visited HFI's offices and had access to HFI's and the Horizon Group's marketing materials, HFI's books and records, and participated in training sessions during which Randall, Matt Randall and Union Central representatives, including O'Toole, trained Randall's Union Central sub-agents to use the LEAP system to sell whole life insurance and the Horizon Notes.

107.    At these training sessions, a Union Central executive would first discuss various insurance products, with an emphasis on whole life insurance.  Next, Randall, his son, or another

33

designee would discuss the LEAP system and how it should be used to bundle insurance products with the Horizon Notes. In doing so, the presenter would give an update on how the Horizon Group was doing and how it fit within the LEAP model, making it absolutely clear that the sub-agents should push the Horizon Notes as a mechanism to help their clients cover the cost of insurance premiums. Thus, Union Central had actual knowledge that Randall's primary sales practice constituted an illegal inducement under section R590-154-10 of Utah's Administrative Code.

108. Even if Randall's sales practices had been proper – and they most certainly were not – he would still have been violating the law and Union Central's stated policies because of his failure to maintain the proper licenses. The fact that Randall was offering and selling promissory notes in investment companies that he owned or controlled was alone a major red flag that should have caused Union Central to investigate further. Significantly, Randall did not have the appropriate broker/dealer licenses and was not selling his securities through a registered broker/dealer as Union Central purported to require. In addition to constituting independent violations of Utah securities laws, Randall's sales practices regarding the Horizon Notes were also expressly prohibited by Union Central's Market Conduct Guide, which set forth Union Central's standards and procedures concerning the marketing and selling of securities products such as the Horizon Notes:

- All securities-related marketing materials must be fair and balanced, and must disclose all pertinent facts regarding an investment;

- The inherent risk of an investment must be explained;

- Exaggerated, unwarranted or misleading statements or claims must not be used; and

- Promissory language must not be used.

109.   In marketing the Horizon Notes, Randall routinely violated each of these standards.

110.   In addition, the Market Conduct Guide contains policies concerning agents who marketed and sold security products.  Any such agent was required to:

- Hold an appropriate NASD registration and state securities registration;

- Pass any and all examinations for every state in which [the agent's] sales efforts are directed, originated or accepted; and

- Be a registered representative of an approved broker/dealer, who is also licensed and appointed in the state of solicitation and in the owner's resident state.

111.   To make matters worse, Randall lost his license to sell insurance in September 2002.  Union Central discovered this fact in November 2002 and purported to give him 90 days to renew it.  Nevertheless, Randall never renewed his license and Union Central took no further action on the matter.  Despite not having a license to solicit insurance and annuity products at any time after 2002, Randall directly participated in the sale, solicitation, and negotiation of insurance products in violation of Utah law for years under Union Central's watch.

112.   These facts, coupled with Union Central's knowledge of Randall's and his Union Central sub-agents' use of the LEAP program to market insurance and annuity products and HFI's consistent record of selling a large number of a high-value policies and annuities should have set off alarm bells at Union Central.  Yet, consistent with Union Central express policy when it came to Randall, it deliberately and recklessly continued to look the other way while Randall defrauded hundreds of Victims.

113.   Union Central continued to support Randall even after its in-house counsel was presented with direct evidence of his and his sub-agents fraud and illegal sales practices.  In September 2008, more than three years before Union Central finally terminated Randall's

general agency, Susan Morris sent a complaint to John Kirtley, in-house counsel for Union Central, detailing the fraudulent activities of Randall and his Union Central sub-agents.  The letter described "the unethical and illegal practices used to induce" the Morrises "to purchase costly life insurance policies . . . brokered by Dee Randall of Horizon Financial."

114.    In her letter, Mrs. Morris described how she and her husband were induced to make an unsecured business loan to a "holding company" and use the monthly interest payments "to purchase life and disability policies that [they] could not have otherwise afforded."   For twelve pages, she detailed the many attempts she made to secure the return of their money, and the numerous fraudulent statements Union Central sub-agents, including Matt Randall and Garrett Gunderson, told her and her husband about the wisdom of the investment strategy.  Mrs. Morris concluded:  "I know this is a lengthy narrative, but my husband and I wanted Union Central to know for certain that we believe we have been defrauded by your agents . . . and their broker, Dee Randall of Horizon Financial and Insurance.  Our association with and 'investment' through them and their 'network' have created extreme financial hardship for our family."

115.    In a November 11, 2008 follow-up letter, Susan Morris wrote, "I wanted you to likewise understand that Union Central is conducting business with persons who have given their risky, illegitimate business schemes an air of stability and credibility by association with life insurance policies through your legitimate, longstanding company."

2. *Union Central knew, or should have known that HFI's marketing materials violated Union Central's standards and procedures.*

116.   HFI's marketing materials, which Union Central had access to, on their own constituted red flags of Randall's willingness to use deceptive or misleading statements in the materials he distributed to customers in violation of both Union Central's Market Conduct Guide and Utah insurance regulations.

117.   While representing Union Central, Randall and his Union Central sub-agents created marketing materials to distinguish themselves from their competitors.  Randall branded HFI as "a financial advisory firm" rather than a life insurance agency – an image Randall carefully crafted with false and misleading representations.  For example, in HFI's glossy marketing brochure:

- "Horizon Financial and Insurance" is shortened to "Horizon Financial," despite the fact that only HFI was authorized to sell insurance;
- Insurance agents are referred to as "trained Horizon Financial Advisors" and "highly trained professional advisors," despite few having any formal training or any certifications as financial advisors;
- HFI's headquarters is referred to as "Horizon Financial Center I," (a building that Randall constructed with millions of dollars of Victim funds) with no reference to insurance, but several references to a castle & moat theme, intended to give clients a false sense of financial security;
- Randall advertises his agent's use of a "unique financial planning process" in providing financial advice; and
- The proclaimed governing vision of HFI is "to deliver [clients and advisors] support to assist them in living an Abundant Life."

118.   The marketing brochure represented HFI to be, in bold capital letters, "the nation's preeminent leader that empowers individuals, families, and communities by educating, promoting, and supporting the principles of the abundant life model."

119.   Indeed, in marketing Horizon Group entities and the financial advisory services he provided through HFI, Randall focused heavily on the biblical concept of living an "Abundant Life" and advertised his financial planning services as the "Abundant Life Model."  *See* John

10:10 ("The thief cometh not, but for to steal, and to kill, and to destroy: I am come that they might have life, and that they might have it more abundantly"). Randall chose these words specifically to resonate with the LDS community in and around Salt Lake City and used the notion of an "Abundant Life" alongside his personal status as a High Priest and respected member of the LDS Church, to convince his Victims, most of whom were also members of the LDS church, of his heightened credibility, personal trustworthiness, and dependability. This, coupled with Union Central's ethics-based marketing message and strong endorsement of Randall, presented a powerful message to Randall's Victims that Randall was a man with whom they could entrust their financial security.

120.    These representations about HFI and the services it is authorized to provide, among others, were designed to help Randall quickly gain the trust and confidence of his victims and convince them to believe without investigation that Randall's financial advice and investment strategies and products would provide them with a safe and secure future.

121.    Randall marketed HMI and the other Horizon Group entities alongside HFI in the same brochure. For example, the HFI marketing brochure states that HMI "was created to assist clients in their overall financial planning" and that its purpose "was to create a company where Investors could have their interest paid monthly." The brochure also states that "[a]s part of the Horizon Group of Companies, [HMI] provides a unique opportunity for clients to create velocity on their money." In other words, Randall did not even attempt to hide the fact that the purpose of HMI was to offer an investment product to his HFI insurance clients that paid monthly interest that could be used to purchase insurance.

122.    Randall and his Union Central sub-agents also hosted seminars at HFI's offices that were attended by Union Central representatives. Randall advertised them as gatherings for

38

laypersons to study various financial planning techniques with "trained financial advisors."  In reality, Randall and other Union Central sub-agents, who were largely untrained and uncertified in professional investment advisory services, led these meetings.  Rather than teaching sound investing techniques, Randall and his Union Central sub-agents used these seminars to generate leads and teach investment strategies using the financial and insurance products they sold.

123.   Simply by holding himself out as a "professional financial advisor," Randall was breaching Union Central's internal sales and marketing policies.  The standards and procedures in the Market Conduct Guide are supposed to implement and ensure Union Central's professed fundamental goal to "provide products, service, and advice that are in the client's best interest."  Accordingly, the Market Conduct Guide required agents to avoid using terms that might mislead a reasonable person, such as "financial planning/planner," "financial recommendations," and "financial consultant."  It also required that any materials used by its agents to market insurance policies must not contain "untrue, deceptive, or misleading statements based upon information included or omitted."

124.   To assure compliance, the Market Conduct Guide required that all marketing materials "developed by an agent must be submitted to the home office for market conduct and legal review prior to use."  Yet, Union Central never caused Randall to stop describing himself and his Union Central sub-agents as financial advisors, despite the fact that the GA Contract gave Union Central a variety of powerful means to force Randall to comply with the Market Conduct Guide, including withholding his compensation or terminating him for cause.

125.   Left alone by Union Central to describe himself and his sub-agents in intentionally misleading and confusing ways to clients and potential clients, Randall leveraged the trust and credibility his relationship with Union Central gave him.  Assisted by Union

Central's public statements that implored the public to rely upon the integrity and professionalism of anyone appointed as an agent of Union Central, Randall convinced his targets to rely on his financial planning advice.  Randall then breached the trust and confidence of his Victims by providing self-interested advice to purchase unsuitable insurance products from Union Central and to invest in his Ponzi scheme.

126.    Had Union Central adequately fulfilled its duty to monitor and supervise the activities of its general agent, Union Central would have discovered that Randall was operating a massive Ponzi scheme and borrowing millions of dollars from Union Central clients and prospects.  Instead of expending any effort to monitor Randall's business practices, or provide any meaningful or reasonable oversight, Union Central continued to support Randall and reaffirm its "faith" in him while earing millions in premiums.

**B. Union Central attempted to maintain its relationship with Randall even after he filed for personal bankruptcy.**

127.    Union Central took affirmative steps to continue its lucrative relationship with Randall after he was forced into bankruptcy and state regulators began investigating Randall's operations.  After learning of Randall's bankruptcy, and the eminent bankruptcy of HMI, Union Central devised a strategy to keep Randall, but ditch his agency.

128.    In an August 30, 2011 email to his Union Central colleagues, Bob Sumrall, a Union Central executive who worked extensively with Randall, wrote: "Plan is to create new Corporate GA [general agency] with [Randall's] top six producers."  Of course, each of those top six producers were instrumental in the proliferation of Randall's Ponzi scheme.

129.    Sumrall explicitly suggested cutting Randall in on the new agency's profits. "All new GA overrides will go to new GA," Sumrall wrote, meaning HFI's income stream of commissions from past sales would be transferred over to the new entity, which he contemplated

naming "Utah Insurance Agency Group" instead of HFI. "Dee Randall, dba Horizon Financial, will go on every application for 10%," he wrote. "Dee will still be the point of contact and acting GA. He will provide leadership, set meetings and continue training. His commitment is three years."

130.    Although Sumrall's plan did not come to fruition, in August 2012, several of Randall's top-producing sub-agents, including Bart Christensen, David Bartholomew, and Ira Sorenson, formed their own general agency, Insight Planning & Insurance Agency, LLC, which Union Central hired as its new general agency in Utah to replace HFI.  Given their impressive sales-records for Union Central, it is no surprise that these Union Central sub-agents were among the most prolific offenders of Utah's regulation against illegal inducements and marketers of the Horizon Notes.  This, however, was apparently of no concern to Union Central.  Indeed, if its decade-long relationship with Randall is any indication, Union Central's only concern appears to be their agents' ability to produce life insurance policies, regardless of how they do it.

131.    To this day, these agents are Union Central's representatives in Utah, and they continue to market themselves as financial advisors and use the LEAP system as the foundation of their sales pitch.  According to their testimony, Union Central has done nothing to clarify its policies, enforce the Market Conduct Guide, introduce new restrictions, or impose new supervisory measures, in the aftermath of the Horizon Group being exposed as a Ponzi scheme. This fact is further indication of Union Central's deliberate and reckless disregard of its duties to monitor and supervise its agents.

## V.    HUNDREDS OF VICTIMS WERE HARMED AS A RESULT OF UNION CENTRAL'S DELIBERATE AND RECKLESS DISREGARD OF ITS DUTY TO SUPERVISE RANDALL.

132.    Hundreds of Victims lost tens of millions of dollars as a direct and proximate result of Union Central's deliberate and reckless disregard of its duty to supervise Randall for

over a decade.  Individuals and families lost homes, life savings, retirement funds, and in many instances, the very means of providing for their daily needs.  Some Victims, previously retired, were forced to take menial jobs for the foreseeable future simply to provide for themselves.

133.    In many cases, these losses meant Union Central's gain, particularly for Victims who purchased Union Central insurance products with the expectation that the return on their Horizon Note would fund the premiums.  After paying Union Central premiums over the course of months and years with the expectation of a large cash surrender value or death benefit, losses from Randall's scheme forced many of the Victims' to let their policies lapse.  While the Victims were saddled with tremendous losses, Union Central profited, as it pocketed millions in premiums paid by Randall's Victims, relieved of any ongoing obligation to pay policy benefits.

## ALLEGATIONS RELEVANT TO STATUTES OF LIMITATIONS

134.    Randall operated the Horizon Group as a Ponzi scheme for over ten years while representing Union Central as its general agent.  Early in his scheme, Randall consistently made the interest payments due on the promissory notes to his Victims.  When Randall's scheme began to collapse and Randall's Victims began to question him, Randall fraudulently concealed the fact that the Horizon Group was a Ponzi scheme through numerous false representations.

135.    In letters that Randall sent to the Victims on the letterhead of various Horizon Group companies, he admitted that the entities were experiencing "short term cash flow issues," but blamed it on the "Great Recession," new restrictions supposedly imposed by the Obama administration, a rise in gasoline prices, and other causes outside of his control.  He assured the Victims in unequivocal language that the Horizon Notes were secured, would be repaid in full, and would continue to accrue interest in the interim.  He further assured the Victims that the Horizon Group was insured against business losses, that the great majority of investors had

expressed a strong desire to maintain their investments in Horizon Notes, and that the Division of Securities had been notified and was "monitoring" the situation.  Of course, all of these representations were false.

136.    Randall also strung Victims along with promises of even greater profitability in the future, for example, claiming that their investments would be a "cash flow heaven" once certain encumbrances were paid off.  He claimed that all of the Horizon Group entities guaranteed one another, and that the Horizon Notes could always be repaid out of HFI's insurance renewal commissions.  Even after Randall filed for bankruptcy in December 2010, Randall continued to represent to Victims that the Horizon Group's various real estate projects were merely behind schedule, and payments on Horizon Notes would soon resume.

137.    Randall repeated these assurances even as the Horizon Group entities were forced into bankruptcy.  In letters mailed during this time period, Randall artfully described the situation as a voluntary decision to wind down operations and pay off investors, never once using the word "bankruptcy."  He repeated his assurances that all Victims would be paid in full, despite knowing that the Horizon Group's assets could only cover a small fraction of its debts.

138.    A reasonable Victim could not have discovered their claims against Union Central earlier because Randall's fraudulent concealment extended to even those facts that would have put them on notice as to the possible existence of any claims.  Randall was the only source the Victims had to get information on the Horizon Group entities and they reasonably relied on Randall's reassurances and fraudulent misrepresentations that their investments were secure. Moreover, Randall chose Victims for their relative lack of financial sophistication or their connection with the LDS Church, which he purposely exploited, first to sell the Horizon Notes

and then to string his Victims along with false representations after he stopped making interest payments.

139.    In doing so, Randall leveraged the credibility of being Union Central's general agent, a position in which he remained until November 2011.  Even after he filed for personal bankruptcy in December 2010, Randall remained a Union Central general agent and continued to market his worthless Horizon Notes alongside Union Central insurance and annuity products and continued to act in Union Central's interests by selling Union Central's products to his Victims.

140.    Thus, in fraudulently concealing his fraud, Randall acted not only to protect himself but also to further Union Central's interests.  As the Horizon Group slid deeper into debt, only the insurance agency, HFI, remained marginally profitable.  Randall therefore focused his efforts on maximizing his sales of Union Central policies in the hopes that increased commissions from insurance sales would keep the Horizon Group afloat a little while longer.  To this end, the letters that Randall sent to Victims often concluded by imploring them to purchase more insurance from Union Central.  Randall also dispatched his Union Central sub-agents to contact the Victims for whom they were responsible, reassure them that their investments were safe, and urge them to buy more Union Central insurance.  Union Central not only reaped the benefits of Randall's fraud, but also Randall's attempts to conceal his fraud.

141.    As a result of Randall's fraudulent concealment, the Victims did not discover, and could not have reasonably discovered, Randall's fraud or Union Central's involvement until September 11, 2013, at the earliest, when Plaintiff filed the Disclosure Statement in the consolidated bankruptcy proceedings that revealed the details of the fraud.  Thus, based upon the statutory discovery rule and the doctrine of fraudulent concealment, the statute of limitations of

44

Plaintiff's claims should be equitably tolled until and including, at the very least, September 11, 2013.

142.     The parties entered into a tolling agreement on October 30, 2013.  The tolling agreement expired on August 2, 2014.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Negligent Hiring

143.     Plaintiff repeats and re-alleges the allegations set forth in all preceding paragraphs hereof as if fully set forth here.

144.     Union Central engaged Randall to act as its general agent pursuant to the terms of the GA Contract on or about February 28, 2000.

145.     Union Central owed its prospective and current clients, including the Victims, a duty to refrain from engaging a general agent that it knew or, with reasonable care should have known, would expose the Victims to a foreseeable risk of harm.

146.     Prior to engaging Randall as its general agent, Union Central knew, or was negligent in not knowing, that Randall posed a foreseeable risk of harm to the Victims.

147.     Specifically, Union Central knew, or was negligent in not knowing, that, among other things:

- Randall's sub-agent, Miller, was operating a fraudulent investment scheme to bolster his insurance sales;

- The SEC had exposed Miller's fraud and had already initiated an action against him;

- Randall had been operating substantially the same scheme for several years while acting as Standard's general agent; and

- Randall was in the midst of several investor lawsuits as a result of Miller's fraud.

45

148.     Union Central breached its duty to the Victims by engaging Randall as its general agent despite these facts.

149.     Upon becoming Union Central's general agent, Randall harmed the Victims, by, among other things, fraudulently inducing the Victims to purchase expensive and unsuitable insurance policies and annuities, and by using fraudulent and deceptive sales practices to induce the Victims to invest in his Ponzi scheme by purchasing Horizon Notes.

150.     But for Union Central engaging Randall as its general agent, the Victims would not have suffered these foreseeable harms.

151.     As a direct and proximate result of Union Central exposing the Victims to a foreseeable risk of harm by engaging Randall as its general agent, the Victims suffered damages in an amount to be proven at trial, but not less than $29.6 million.

## SECOND CAUSE OF ACTION
### Negligent Supervision

152.     Plaintiff repeats and re-alleges the allegations set forth in all preceding paragraphs hereof as if fully set forth here.

153.     Union Central engaged Randall to act as its general agent pursuant to the terms of the GA Contract on or about February 28, 2000.  At all relevant times after that date, Union Central held Randall out to the public as its general agent.

154.     After engaging Randall as its general agent, Union Central had a duty to adequately supervise Randall in the performance of his duties under the GA Contract, including his practices concerning the solicitation of applications for Union Central insurance policies. Union Central also had a duty to prevent Randall from causing foreseeable harms to the Victims.

155.    Union Central knew, or was negligent in not knowing, that Randall posed a foreseeable risk of harm to the Victims as a result of the numerous red flags of Randall's fraud. For example, Union Central knew, or consciously avoided knowing, that, among other things:

- Randall was offering and selling high-interest rate promissory notes issued from companies he owned or controlled to the Victims without the securities licenses required by Union Central's standards and procedures;

- Randall used deceptive and misleading marketing materials and sales practices to market and sell both Union Central insurance and annuity products and the Horizon Notes in violation of Union Central's standards and procedures;

- Randall was directly involved in the sale, solicitation, and negotiation of insurance products without a license in violation of Utah law;

- Randall bolstered HFI's insurance sales by illegally inducing his clients to purchase unsuitable insurance and annuity products by pairing them with a Horizon Note; and

- Randall and many of his Union Central sub-agents sold an unusually high number of expensive life insurance and annuity products, many of which were unsuitable.

156.    Union Central deliberately and recklessly breached its duty to supervise Randall by failing to take adequate steps to prevent him from harming the Victims through the use of fraudulent and deceptive sales practices to sell the Victims expensive and unsuitable insurance products and the Horizon Notes.

157.    While acting as Union Central's general agent, Randall harmed the Victims, by, among other things, fraudulently inducing the Victims to purchase expensive and unsuitable insurance policies and annuities, and by using fraudulent and deceptive sales practices to induce the Victims to invest in his Ponzi scheme through the purchase of Horizon Notes.

158.     Union Central directly benefitted from Randall's wrongful conduct and fraudulent marketing and sales tactics by reaping massive profits from his and his sub-agents' sale of insurance and annuity products.

159.     But for Union Central's failure to adequately supervise Randall, Randall could not have continued to perpetrate his fraud or operate the Horizon Group as a Ponzi scheme.

160.     As a direct and proximate result of Union Central's deliberate and reckless breach of its duty to supervise Randall, HFI, and Randall's numerous sub-agents, the Victims suffered damages in an amount to be proven at trial, but not less than $29.6 million.  Moreover, because Union Central acted with deliberate and reckless indifference to the wellbeing of the Victims by failing to supervise Randall after it knew that he posed a foreseeable risk of harm to the Victims, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Negligent Retention

161.     Plaintiff repeats and re-alleges the allegations set forth in all preceding paragraphs hereof as if fully set forth here.

162.     Union Central engaged Randall to act as its general agent pursuant to the terms of the GA Contract on or about February 28, 2000.

163.     Union Central owed its prospective and current clients, including the Victims, a duty not to associate with a general agent that it knew or, with reasonable care should have known, posed foreseeable risk of harm to Randall's Victims.

164.     Union Central knew, or was negligent in not knowing, that Randall posed a foreseeable risk of harm to the Victims as a result of the numerous red flags of Randall's fraud. For example, Union Central knew, or consciously avoided knowing, that, among other things:

- Randall was offering and selling high-interest rate promissory notes issued from companies he owned or controlled to the Victims without the securities licenses required by Union Central's standards and procedures;

- Randall used deceptive and misleading marketing materials and sales practices to market and sell both Union Central insurance and annuity products and the Horizon Notes in violation of Union Central's standards and procedures;

- Randall was directly involved in the sale, solicitation, and negotiation of insurance products without a license in violation of Utah law;

- Randall bolstered HFI's insurance sales by illegally inducing his clients to purchase unsuitable insurance and annuity products by pairing them with a Horizon Note; and

- Randall and many of his Union Central sub-agents sold an unusually high number of expensive life insurance and annuity products, many of which were unsuitable.

165.    Union Central deliberately and recklessly breached its duty to the Victims by continuing to engage Randall as its general agent despite these facts.

166.    While acting as Union Central's general agent, Randall harmed the Victims, by, among other things, fraudulently inducing them to purchase expensive and unsuitable insurance policies and annuities, and by using fraudulent and deceptive sales practices to induce the Victims to invest in his Ponzi scheme by purchasing Horizon Notes.

167.    But for Union Central's negligent retention of Randall as its general agent, the Victims would not have suffered such harm.

168.    As a direct and proximate result of Union Central's deliberate and reckless retention of Randall as its general agent after it knew or should have known that Randall posed a foreseeable risk of harm to the Victims, the Victims suffered actual damages in an amount to be proven at trial, but not less than $29.6 million.  Moreover, because Union Central acted with deliberate and reckless indifference to the wellbeing of the Victims by retaining Randall despite

having knowledge that Randall posed a foreseeable risk of harm to the Victims, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Securities Fraud – Control Person Liability
### (Sections 61-1-1 and 61-1-22 of the Utah Uniform Securities Act)

169.    Plaintiff repeats and re-alleges the allegations set forth in all preceding paragraphs hereof as if fully set forth here.

170.    Randall and his Union Central sub-agents participated in the offer and sale of securities, including the Horizon Notes, to the Victims.

171.    In violation of Utah Code § 61-1-1, Randall and his Union Central sub-agents intentionally or recklessly made false statements of material fact, or failed to disclose material facts necessary to render statements made, in light of the circumstances under which they were made, not misleading.

172.    Specifically, Randall and his Union Central sub-agents made the following false statements of material fact, among others, in connection with the offer and sale of the Horizon Notes:

- That no commissions were paid in connection with the sale of the Horizon Notes;

- Investments in Horizon Auto were secured by car titles, or the automobiles themselves, which could be repossessed to ensure that their investment was protected;

- The Horizon Notes were secured by Randall's personal life insurance policy;

- The Horizon Notes were secured by real estate;

- The value of the real estate held by the Horizon Group far exceeded the companies' liabilities;

- Investments were "guaranteed" or collateralized by a specific real estate project;

- The investor would not lose their money;

- Investor funds would be used for a specific project, such as auto loans or real estate construction;

- The investment was "as secure as anything out there";

- The investment involved no risk, and could only fail "if the whole country went down";

- The investment would be "no fail" and there was plenty of "insurance to cover loss";

- After funds were raised to pay off a certain balloon payment, the investment would be "cash-flow heaven";

- Randall always had at least $1 million in the bank that he could use as a slush fund; and

- Randall had never declared bankruptcy and was not running a Ponzi scheme.

173.   Randall and his Union Central sub-agents also failed to disclose the following material facts in connection with the offer and sale of the Horizon Notes:

- Randall and his wife had previously filed for personal bankruptcy;

- HMI's failure to make interest payments on the Horizon Notes could result in the victim's insurance policies, purchased in conjunction with the note, to lapse; and

- HMI and HFI commingled funds.

174.   The Victims did not know that Randall's and his Union Central sub-agents' representations were false nor did they know of any of the material facts Randall and his Union Central sub-agents failed to disclose.

175.   As a direct and proximate result of Randall's and his Union Central sub-agents' intentional or reckless violations of Utah Code § 61-1-1(2), the Victims have suffered damages in an amount to be proven at trial, but in no event less than $11.1 million plus statutory interest in the amount of no less than $6.9 million.  Moreover, because Randall's and his Union Central

sub-agents' violations were intentional or reckless, Plaintiff is entitled to treble damages pursuant to Utah Code § 61-1-22(2).

176.    Randall also exercised undue influence over his Victims in the perpetration of his fraud.  Randall held a position of authority, trust, and confidence with his Victims that he obtained as a result of Union Central's ethics-based marketing materials, his status in the LDS Church, and his religious based marketing message of offering a path to an "Abundant Life."  As result, Randall's Victims perceived him as having heightened credibility, personal trustworthiness, and dependability.  Randall exploited the trust and confidence his Victims bestowed upon him by advising them to purchase the Horizon Notes.  Because Randall's violations of Utah Code § 61-1-1(2) involved fraud in connection with an investment by persons over whom Randall exercised undue influence, Plaintiff is entitled to treble damages pursuant to Utah Code § 61-1-22(2)(B).

177.    Union Central directly or indirectly controlled Randall during all times relevant to his offer and sale of securities in violation of Utah Code § 61-1-1(2) by virtue of the broad control rights that the GA Contract granted Union Central over its agents.

178.    Pursuant to Utah Code § 61-1-22(4), Union Central is jointly and severally liable for the damages the Victims suffered as a direct and proximate result of Randall's intentional or reckless violation of Utah Code § 61-1-1(2).

## FIFTH CAUSE OF ACTION
### Unjust Enrichment

179.    Plaintiff repeats and re-alleges the allegations set forth in all preceding paragraphs hereof as if fully set forth here.

180.    Randall and his Union Central sub-agents "illegally induced" the Victims to purchase Union Central insurance and annuity products unsuitable to their needs and

circumstances by pairing such products with this fraudulent Horizon Notes and through other fraudulent or deceptive means. By promising a steady stream of interest income derived from the Horizon Notes, Randall and his Union Central sub-agents duped many of the Victims into purchasing more expensive insurance and annuity products than they could otherwise afford.

181.   As a result of Randall's and his Union Central sub-agents' illegal inducement and fraudulent sales practices, the Victims paid millions in premiums on such insurance and annuity products to Union Central.

182.   After Randall's Ponzi scheme collapsed and he stopped making interest payments on the Horizon Notes, many of the Victims could no longer afford to make the premium payments on their insurance and annuity products and were forced to let their policies lapse. As a result, they lost their entitlement to all of the benefits of the policy or annuity.

183.   When the policies lapsed, Union Central retained the premiums paid by the Victims with no risk of ever having to pay any of the benefits associated with the insurance policies and annuities.

184.   Union Central knew, or should have known, that Randall and his Union Central sub-agents were inducing the Victims to purchase unsuitable policies and annuity products through "illegal" or fraudulent and deceptive means and knew of the benefit they received when such policies and annuities lapsed.

185.   Thus, Union Central was unjustly enriched in an amount to be proven at trial, but in no event less than $3.3 million, equaling the premiums paid by the Victims of Randall's and his Union Central sub-agents' fraud and its retention of premiums paid by the Victims would be inequitable.

<u>**DEMAND FOR JURY**</u>

Plaintiff demands a jury trial and hereby tenders the appropriate fee with this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in favor of Plaintiff, and against Defendants, jointly and severally, as follows:

a.      Damages for all actual and consequential losses suffered by the members of the Victims PAT in an amount to be proven at trial but in no event less than $29.6 million;

b.      Disgorgement of all ill-gotten profits earned by Defendants;

c.      Disgorgement of all premiums paid by the Victims as a result of Randall's and his Union Central sub-agents' fraudulent activities;

d.      An award of treble damages pursuant to Utah Code § 61-1-22-(2);

e.      An award of punitive and/or exemplary damages in the maximum amount permitted by law;

f.      Prejudgment and post-judgment interest on the foregoing amounts at the maximum rate permitted by law or equity;

g.      Reasonable attorneys' fees and costs incurred in the prosecution of this action to the extent allowed by law; and

h.      Such other and further relief as the Court determines is just and proper.

**Dated:** August 5, 2014                                **RAY QUINNEY & NEBEKER, P.C.**


/s/ Mark W. Pugsley
Mark W. Pugsley (Utah Bar No. 8253)

William T. Reid, IV
Gregory S. Schwegmann
Seth S. Harp
REID COLLINS & TSAI LLP

*Attorneys for Plaintiff Gil A. Miller, as the Trustee of the Randall Victims Private Actions Trust*

54