EXHIBIT A



# EXPERT WITNESS REPORT

## Gil A. Miller, Trustee of the Randall Victims Private Actions Trust

## v.

## Union Central Life Insurance Company, et. al.

Case 2:14-cv-00575

*Submitted by:*

**James T. Wood, CPA/CFF, CFE**

Principal

*Date of Report:*

August 10, 2017



## A. INTRODUCTION

Lone Peak Valuation Group[1] has been engaged to review and respond to the Expert Report and Disclosure of Gil A. Miller dated June 26, 2017. This report is intended to provide my opinions and the bases for the opinions required pursuant to Federal Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

The opinions and findings expressed herein are based on my work to date, documents produced in this case, and my experience. The information I have reviewed or relied on is itemized in Appendix A and is referenced in the footnotes to this report. I may supplement, update, or otherwise modify this report at a later date based on additional documents or information produced during the proceedings of this matter.

The opinions contained herein are given to a reasonable degree of professional certainty and have been conducted using conventional methodologies. This report has been prepared solely in connection with the litigation referenced herein and is intended for no other use.

## B. QUALIFICATIONS

I am a Principal of Lone Peak Valuation Group.  Prior to joining Lone Peak, I was a Managing Director with the StoneTurn Group, where I led investigation and consulting engagements. Before StoneTurn, I was a Supervisory Forensic Accountant at the Federal Bureau of Investigation in both Salt Lake City and Washington, D.C. While in Washington, I headed the agency's Forensic Accountant Support Team at FBI headquarters. I began my career in the forensics practice at PricewaterhouseCoopers.  I have over nine years of experience in conducting forensic accounting and fraud investigations, and am a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, and a Certified Fraud Examiner.  I have also taught and/or currently teach courses as an adjunct instructor in financial accounting, auditing, and forensic accounting at American University, The

---

[1] This engagement, as with all of Lone Peak's engagements, has been completed through the efforts of multiple individuals. Because I intend to testify regarding the opinions described in this report, I have typically used singular pronouns such as "me," "I," etc. to describe the basis for these opinions.  This is not meant, however, to suggest that this report is a result of only my own efforts.

LONEPEAK
VALUATION GROUP

25 George Washington University, and the University of Utah. Appendix B contains a copy of my
26 Curriculum Vitae detailing my qualifications, publications, speeches, and prior testimony.

## C.   COMPENSATION

28 Lone Peak is being compensated for work in this matter at its current standard hourly rates
29 charged for each person working on the project.  Lone Peak's rates range from $45 to $255 per
30 hour.  No part of Lone Peak's compensation is dependent on the outcome of this litigation.

## D.   BACKGROUND

32 The following is a summary of the salient events leading up to this litigation.  This section is not
33 meant to be testimony regarding the factual background of the case, but merely serves as a frame
34 of reference for the opinions that follow this section.

### 1.  Plaintiff

36 The plaintiff, Gil A. Miller, Chapter 11 Trustee (the "Trustee") is the Chapter 11 bankruptcy
37 trustee for the consolidated estates of Dee Allen Randall and the Randall Victims Private Actions
38 Trust ("PAT"); Horizon Mortgage and Investment, Inc. ("Horizon Mortgage"); Horizon
39 Financial & Insurance Group Inc. ("Horizon Insurance"); Horizon Auto Financing, LLC
40 ("Horizon Auto"); Independent Commercial Lending, LLC ("Independent Commercial"); and
41 Horizon Financial Center I, LLC ("Horizon Financial Center") (collectively, the "Debtors" or the
42 "Randall Enterprise").

### 2.  Defendant

44 The Union Central Life Insurance Company ("Union Central") is a life insurance underwriter for
45 which Horizon Insurance was a general agent.

### 3.  Events leading to this litigation

47 Union Central entered into a general agency agreement ("Agency Agreement") with Horizon
48 Insurance on February 28, 2000. The Trustee claims that Union Central was integral to the
49 sustaining of the Randall Enterprise Ponzi Scheme and was negligent in what the Trustee has
50 called Union Central's "hiring, supervision and retention" of Mr. Randall and is therefore liable



for losses sustained by PAT investors as well as premiums paid on certain Union Central insurance policies, sold through Horizon Insurance. The Trustee also alleges that Union Central knew or should have known that Horizon Mortgage was increasingly insolvent and operating with the characteristics of a Ponzi prior to its collapse.

## E.   SCOPE

I have been asked to analyze and respond to Mr. Miller's opinions and calculations, explain alternative economic loss models to correct for flaws and errors in Mr. Miller's calculations, and to prepare alternative economic loss calculations using the correct economic loss models as they relate to the claims in this case.

The Trustee claims that PAT members have incurred significant damage as a result of the negligence of Union Central in "hiring, supervising, and retaining" Horizon Insurance, allowing the Randall Enterprise Ponzi scheme to continue to operate until the Trustee caused the Randall Entities to file Bankruptcy on October 12, 2011.[2] The Trustee also claims Union Central's actions or inactions violated Utah State Securities laws. Mr. Miller has elected to measure the economic impact of such claims himself.

Mr. Miller's economic loss opinions can be summarized as follows:

1) PAT members' total losses June 7, 1996 through July 31, 2011 is $32,359,045, before prejudgment interest.[3]

2) PAT members' losses on or after October 30, 2008 pursuant to Utah Code Ann. §61-1-22 is $23,121,069.[4]

3) PAT members' losses on or after October 30, 2008 pursuant to Utah Code Ann. §61-1-22, including treble damages is $44,744,979.[5]

In this case, I have been asked to analyze and respond to Mr. Miller's opinions and calculations, explain alternative economic loss models to correct for flaws and errors in Mr. Miller's

---

[2] *Miller v. Union Central Life Ins. Co., et al*, Case No. 2:14-cv-00575, (Complaint, August 5, 2014), p. 45 – 48 ("Complaint")
[3] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 18
[4] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 19
[5] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 19



75 calculations, and to prepare alternative economic loss calculations according to these economic
76 loss models.

## F.    OPINIONS TO BE EXPRESSED

78 **OPINION 1: The complexity and inherent fraudulent characteristics of a Ponzi scheme**
79 **often make them difficult to identify, discover, and unravel prior to the scheme's actual**
80 **collapse. With the benefit of hindsight and access to all available data, the red flags of an**
81 **investment scheme become more visible and frequently become obvious to investigators**
82 **and other outside parties after the collapse of the scheme.**

83 During my years of experience as a forensic accounting expert with the FBI, which involved the

84 detailed investigation of numerous financial frauds around the country, I had the opportunity to

85 objectively investigate a number of alleged Ponzi schemes while they were still in operation. In

86 several cases, after completing the investigation, these alleged schemes proved to be poorly run

87 businesses or poorly managed investments rather than actual Ponzi schemes or frauds.

88 Mr. Bowman's report also further explains that it is common to find the presence of many of the

89 characteristics that Mr. Miller describes as "red flags", in conjunction with legitimate business

90 operations.[6, 7]

91 In my experience, Ponzi Scheme operators not only typically lie to and manipulate their

92 investors, but can be successful in deceiving other financially literate parties, including financial

93 professionals, independent auditors, and even government regulators who have a mandate to

94 identify and halt these specific frauds.

95 This case is no exception. Deception, fabrication, and misstatements were used by Mr. Randall to

96 further his scheme and deceive his investors, his independent auditors, regulators, and the

97 defendant in this case, Union Central. This deception included:

98 • Fabricating documentation to support financial statements;
99 • Overstating assets, returns, and investment reliability;
100 • Understating liabilities; and
101 • Understating investment risk

---

[6] Expert Report and Disclosure of Kent M. Bowman, Case No. 2:14-cv-00575, August 10, 2017, p. 13, Opinion 6
[7] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 11 - 16, Opinion 2



102    The facts of this case are unfortunately similar to many Ponzi Schemes I have investigated.

103    Specifically, this case includes hundreds of individuals who invested with a seemingly-legitimate

104    business entity and who received financial information, prospectuses, and promissory notes,

105    which contained false and misleading information which, in hindsight, led to the scheme

106    exhibiting many of the red flags referenced by Mr. Miller. Despite these characteristics being red

107    flags, in hindsight, none of these hundreds (and potentially thousands) of people, including

108    investors, auditors, regulators, insurance agents, and insurance companies recognized these signs

109    at the time the business was operating. In my experience, these signs are often missed by

110    individuals in the moment, explained away by the perpetrator, unknown because of information

111    not disclosed, or rationalized away by considering other possible explanations.

112    Evaluating the documents and transactions associated with these schemes after failure of the

113    scheme often makes their fraudulent operations seem obvious when evaluated absent the Ponzi

114    Scheme operator, with an unobstructed view of the results and access to all of the necessary

115    documents to see the whole of the scheme. In many cases, the unraveling of a scheme and final

116    determination that it is in fact a Ponzi scheme, or what is often the prerogative of a Trustee or

117    Receiver – to determine when an entity began operating as a Ponzi scheme – takes years and

118    hundreds (sometimes thousands) of hours of professional investigation and the gathering of

119    thousands of reliable source documents, banking records, and accounting records, as well as

120    conducting individual interviews. In my experience, it is not uncommon for individuals intimate

121    with the innerworkings (and even within the accounting function) of a scheme to not understand

122    or realize that the entity they are affiliated with is in fact a Ponzi scheme until after it has failed.

123    **OPINION 2: The defining characteristic of a Ponzi Scheme, "using new investor money to**
124    **pay earlier investors," is not revealed by examining Horizon Mortgage's 2001 audited**
125    **financial statements alone. As a result, an individual would not have been able to**
126    **determine, based on a review of Horizon Mortgage's 2001 audited financial statements,**
127    **that Horizon Mortgage was a Ponzi scheme.**

128    In certain fraud examinations, including a Ponzi scheme cash-flow analysis, netting cash

129    transactions is a useful and sometimes necessary approach in assessing and, ultimately, proving

130    that a company's operations are indicative of fraud (including that they exhibit the characteristics

131    of a Ponzi scheme). This is frequently the case because cash is fungible and might be

132    commingled in underlying bank accounts. This approach is frequently used to determine whether



133   sufficient sources of cash to pay earlier investor returns exist without the use of new investor
134   funds.

135   However, this methodology for concluding that new investor money was used to pay earlier
136   investors is only reliable if there are insufficient alternative sources of cash to cover interest and
137   principal payments to earlier investors without relying on cash inflows from new investors
138   during the time period analyzed. In this case, for at least 2000 and 2001, the audited financial
139   statements that Mr. Miller relied on for his opinion indicate there were sufficient alternative
140   sources of cash, other than new investor money, to cover investor interest and principal
141   payments. Indeed, the two years of operations described in the audited financial statements sent
142   to Union Central that are discussed in Mr. Miller's Opinion 2 are two years during which there
143   were, in fact, sufficient sources of cash beyond new investor money to cover interest and
144   principal payments to investors.

145   Mr. Miller states, "Horizon Mortgage was using investor money to pay earlier investors."[8] This
146   statement appears to be based solely on Mr. Miller's review of the Horizon Mortgage financial
147   statements, with specific reliance on the Statements of Cash Flows. He states, "The Statements
148   of Cash Flows showed that Horizon received cash of $3,437,625 in 2001 from note and equity
149   investors which *largely funded [Horizon's] payments of interest and principal to earlier*
150   *investors*" [emphasis added].[9] Mr. Miller does not appear to consider the other potential sources
151   of cash which are apparent in the same Statements of Cash Flows and Income Statement that
152   could also have been used to pay earlier investors.

153   The following table summarizes available sources of cash inflows from sources other than new
154   investor funds and demonstrates that there were sufficient cash inflows to cover the returns to the
155   investors:

---

[8] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p.14
[9] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p.14



| FINANCIAL STATEMENT LINE ITEMS | 2001 | 2000 |
|---|---|---|
| Payments received on Notes Receivable | $ 1,736,894 | $ 1,365,714 |
| Proceeds from sale of Property and Equipment | $ 146,163 | $ 161,014 |
| **Total Cash Inflows from Investing Activities** | **$ 1,883,057** | **$ 1,526,728** |
| | | |
| Interest income from loans | $ 291,841 | $ 496,528 |
| Rental income | $ 347,357 | $ 295,115 |
| Commission income | $ 30,273 | $ 24,448 |
| Bad debt recovery | $ 92,927 | $ 162,618 |
| **Total Inflows from Revenues (if assumed to be cash)** | **$ 762,398** | **$ 978,709** |
| | | |
| **Total Available Cash Inflows** | **$ 2,645,455** | **$ 2,505,437** |
| | | |
| Cash Paid for Interest | $ (1,655,657) | $ (1,385,884) |
| Payments on Notes Payable | $ (573,293) | $ (742,158) |
| **Total Investor Cash Outflows** | **$ (2,228,950)** | **$ (2,128,042)** |
| **Excess Cash Available after Investor Interest and Principal Payments** | **$ 416,505** | **$ 377,395** |

As demonstrated above, relying solely on company's Statements of Cash Flows may not, in all cases, provide a sufficient basis from which to draw conclusions about the sources of funds used to make interest and principal payments in a Ponzi scheme.

To the extent an individual, with or without requisite accounting skill, reviewed the audited financial statements of Horizon Mortgage for 2000 to 2001, it is reasonable he or she could have concluded that, during the time period presented, the entity had sufficient non-investor sources of cash to fund the entity's interest and principal payments to earlier investors.

**OPINION 3: The proper methodology to calculate investor economic losses should account for variables in investor behavior, unrelated to the Agency Agreement, hypothetical collapse dates of the scheme, and additional actual and potential loss-mitigating actions of Mr. Randall.**

### Economic Loss Calculation – "But For" Analysis

Economic loss calculations related to negligence claims are typically calculated using a "but for" analysis methodology:

> "The primary aim in measuring damages is compensation, and this contemplates that the damages for a tort should place the injured person as nearly as possible in



173      the condition he would have occupied if the wrong had not occurred"[10]

174 This analysis method requires the expert to calculate the plaintiff's economic position as if the

175 harmful event had not occurred and determine the difference between that position and the

176 plaintiff's current economic position, taking into account any economic events that mitigate

177 these economic losses.

178 In calculating economic losses, an expert should also consider "documentary evidence, sworn

179 statements, and other disclosures [that] may reveal facts that influence the expert's analysis of

180 damages."[11]

181 In sum, if it is proven at trial that the existence of the Agency Agreement caused a PAT member

182 to make investments and purchase certain insurance policies, the economic loss would be

183 calculated based on those investments and insurance policies which would have been avoided,

184 but for the Agency Agreement. Conversely, if the events leading to the investment and insurance

185 premium purchase would have occurred regardless of the Agency Agreement, any economic loss

186 to the members of the PAT would not be attributable to Union Central.

187 In this matter, the PAT Members' claims, along with one other non-negligence related claim,

188 include the following negligent acts ("Alleged Wrongful Conduct"):

189      • **Negligent Hiring.** "Union Central breached its duty to the Victims by engaging Randall

190         as its general agent…."[12]

191      • **Negligent Supervision.** "*After* engaging Randall as its general agent, Union Central had

192         a duty to adequately supervise Randall in the performance of his duties under the GA

193         Contract, including his practices concerning the solicitation of applications for Union

194         Central insurance policies. Union Central also had a duty to prevent Randall from causing

195         foreseeable harms to the Victims…. Union Central deliberately and recklessly breached

196         its duty to supervise Randall by failing to take adequate steps to prevent him from

197         harming the Victims through the use of fraudulent and deceptive sales practices to sell the

---

[10] AICPA FVS Practice Aid, Discount Rates, Risk, and Uncertainty in Economic Damage Calculations (2013), p. 23
[11] AICPA FVS Practice Aid, Discount Rates, Risk, and Uncertainty in Economic Damage Calculations (2013), p. 26
[12] Complaint, p. 46

LONEPEAK
VALUATION GROUP

198 Victims expensive and unsuitable insurance products and the Horizon Notes."[13]

199 • **Negligent Retention.** "Union Central owed its prospective and current clients, including
200   the Victims, a duty not to associate with a general agent that it knew or, with reasonable
201   care should have known, posed foreseeable risk of harm to Randall's Victims. Union
202   Central knew, or was negligent in not knowing, that Randall posed a foreseeable risk of
203   harm to the Victims as a result of the numerous red flags of Randall's fraud…. Union
204   Central deliberately and recklessly breached its duty to the Victims by continuing to
205   engage Randall as its general agent…."[14]

206 Given these three claims, A proper economic loss analysis in this matter requires the
207 consideration of the economic consequences, if:

208   (1) Union Central had not entered into the Agency Agreement (Negligent Hiring claim),
209   or

210   (2) Union Central had terminated the Agency Agreement at some point in time prior to its
211   actual termination on November 9, 2011 (Negligent Supervision and Negligent Retention
212   claims).[15, 16]

213 In considering these economic consequences for calculating appropriate economic losses
214 attributable to Union Central, one must ask, among other things, if the Agency Agreement were
215 either (a) never entered into or (b) terminated at an earlier date, on what date would the Ponzi
216 scheme, which is the ultimate source of economic losses in this case, collapse, if before October
217 12, 2011?

218 This question is vital to making an appropriate economic loss calculation. If, for example, the
219 Ponzi scheme, absent Agency Agreement, would not fail prior to October 12, 2011, or if it is

---

[13] Complaint, p. 46-47.
[14] Complaint, p. 48-49.
[15] I have separated the three negligence claims into two categories because they can potentially have two different dates. In other words, if the Finder of Fact determines that Union Central is liable for Negligent Hiring, the economic losses would begin sometime on or after the Negligent Hiring occurs, or sometime on or after February 28, 2000. In contrast, if the Finder of Fact determines that Union Central is not liable for Negligent Hiring, but is liable for Negligent Supervision and/or Negligent Retention, the economic losses would begin at some point in time on or after the Negligent Supervision and/or Negligent Retention occurs, which would likely be after February 28, 2000.
[16] Complaint, p. 10



220 determinable based on available evidence that those same investors would still have either
221 invested or remained invested after the termination of the Agency Agreement with Mr. Randall
222 (see Opinion 4), none of the investment losses for any investors would be reasonably attributable
223 to the Agency Agreement.

## **Damage Dates**

225 To appropriately calculate economic losses, one of the first steps in making a calculation is to
226 determine the date from which to start calculating economic losses for the victim and as the basis
227 to determine their "but for" economic position. Possible dates include: "date of violation, date
228 the violation ceased, date of trial, date of recovery, or some other date."[17] It follows that if no
229 date is provided or can be reasonably determined, it would be impossible to make a calculation.

230 To calculate economic losses in this matter, several dates become important in determining the
231 dates upon which to base the "but for" economic position of the victims:

232     1) The date at which the Alleged Wrongful Conduct occurred ("Negligence
233        Date")

234     2) The date at which the Ponzi Scheme would actually collapse "but for" the
235        Alleged Wrongful Conduct ("Hypothetical Collapse Date")

236     3) The dates of investments and returns ("Investment Dates")

237     4) The dates of purchase for Union Central insurance policies ("Policy Dates")

### **Negligence Date**

239 In this matter, I understand that Plaintiffs intend to argue that there may be various potential
240 Negligence Dates. In general, I have grouped these potential dates into two categories:

241 • Date of Hiring: In this matter the date of engagement, or the date on which Union Central
242    entered into the Agency Agreement is February 28, 2000.[18]

243 • Dates of Negligent Supervision and Retention: Dates specific to these two claims or an
244    initial date representing the negligence associated with these two claims are not provided

---

[17] The Litigation Services Handbook (6th Edition), Weil, section 4.24(d)
[18] Complaint, p. 45

LONEPEAK
VALUATION GROUP

245      or are not clear in the calculation performed in Mr. Miller's report. To the extent
246      Plaintiffs intend to present one or more such potential dates at trial, I would expect each
247      date to have its own economic loss calculation.

248 **Hypothetical Collapse Date**

249 Once a Negligence Date is established, the subsequent date the Ponzi scheme would actually
250 collapse as a result of the Alleged Wrongful Conduct must also be determined in order to
251 calculate certain economic losses.

252 **Investment Date**

253 After a determination of the hypothetical collapse date associated with the Ponzi scheme, and in
254 order to calculate economic losses, the dates of investment and returns must be considered as
255 they relate to the Negligence Date and Hypothetical Collapse Date, making adjustments for
256 investor losses based on the "but for" economic position of the investors on those dates, as
257 appropriate.

258 After determining the date on which to begin calculating economic losses in a "but for" scenario,
259 it is also necessary to consider the following factors to appropriately calculate investment related
260 economic losses:

261      1) **Investor Behavior:** Investor behaviors and actions that would be influenced by and also
262          those that would not be influenced by the Agency Agreement.

263      2) **Mr. Randall's Behaviors and Abilities:** Mr. Randall's abilities to keep, entice, lull or
264          otherwise maintain and gain new investor relationships regardless of the Agency
265          Agreement. I have discussed this behavior and ability further in Opinion 4 as it relates to
266          Mr. Randall's ability to continue to operate the Ponzi Scheme following actual periods of
267          cash flow shortages. Given the nature of a Ponzi scheme, Mr. Randall's abilities to retain
268          and gain new investors are interrelated to his abilities to prolong the duration of the
269          scheme, thereby preventing or delaying its collapse. In determining appropriate loss
270          calculations, this ability and his actions must be considered in extending the duration of
271          the Ponzi Scheme.



272 **Investor Behavior**

273 A proper economic loss calculation must take into account a reasonable economic position of the
274 PAT Members' investments given an early termination of the Agency Agreement. Several
275 factors would determine the PAT Members' investment status at the determined Negligence Date
276 and Hypothetical Collapse Date "but for" the agency agreement. I have identified two general
277 groups of investors based on their behaviors in association with the Agency Agreement as
278 described in their investor questionnaire responses:

279     1) Investors who would have never invested with Mr. Randall without the Agency
280        Agreement being in place ("Soft Investors"). Soft Investors reflect those seeking a
281        life insurance policy who also purchased a promissory note. Because they were
282        not seeking a promissory note investment, the Soft Investors likely would not
283        have purchased a promissory note absent an insurance agency relationship
284        between the Randall Enterprise and a life insurance company such as Union
285        Central.

286     2) Investors who had already or would have invested with Mr. Randall regardless of
287        the Agency Agreement ("Solid Investors"). Solid Investors reflect investors
288        seeking an investment in a promissory note who may or may not have also
289        purchased a life insurance policy. Because they sought a promissory note
290        investment, the accounting evidence and my experience investigating and
291        analyzing Ponzi schemes indicates to me that Solid Investors would have likely
292        invested in the promissory notes with or without the Agency Agreement.

293 Ultimately, the categorization of investors based on the above described criteria must be done on
294 an individual investor basis and will depend on the facts and circumstances for each investor. In
295 order to categorize investors as described herein, I have utilized the questionnaires provided by
296 PAT Members, PAT Member related interrogatories, as well as PAT Member depositions.[19]

---

[19] PAT Member questionnaires, interrogatories, and depositions

LONEPEAK
VALUATION GROUP

297     In my review of the PAT Member related interrogatories I did not find sufficient information to
298     categorize these investors as described above.

299     To the extent that a PAT Member was not deposed or did not complete and provide the investor
300     questionnaire, I have insufficient information to understand their perspective on the purpose of
301     their investment at this time.[20] I reserve the right to amend my calculations pending their
302     testimony at trial or receipt of additional information related to these PAT Members.

303     **Soft Investors**

304     According to the questionnaires signed by the PAT Members, the vast majority (93.1%) of the
305     PAT Members were not seeking insurance policies when they approached the Randall
306     Enterprise. Rather, they sought out investments in promissory notes and some of the PAT
307     Members also bought insurance policies in connection with the promissory notes. Specifically,
308     only 15 PAT Members, or 6.9%, of the 217 PAT members who completed questionnaires,
309     appear to have sought an insurance policy first and ended up also investing in a promissory note.
310     These 15 PAT Members would be considered Soft Investors based on the categorization I've
311     described above. The remaining 202 PAT Members (93.1%) who sought an investment in a
312     promissory note from the Randall Enterprise would be considered Solid Investors.

313     In my review of the depositions of several PAT Members in this case, I found that their
314     introduction to Mr. Randall came not through their looking for an insurance agent, or a Union
315     Central affiliated organization, but they were rather referred, as is common for Ponzi scheme
316     investments I have investigated, through those who had personal relationships to Mr. Randall
317     because they understood and believed he offered a lucrative and reliable investment
318     opportunity.[21] The association and affiliation with Union Central appears, at most, secondary to
319     the investment and, although that might be important to some, would not have made investors
320     unable to find Mr. Randall.

321     Calculation of investment losses for this category of investors would be as follows, depending on

---

[20] On July 18, 2017, a "Joint stipulation to dismiss the claims of certain members of the PAT" was filed with the court. I have excluded these claims from my calculations because I understand all of these dismissed member claims also did not complete questionnaires.
[21] PAT Investor Depositions



322    the negligence claim:

323       1)  If the Trier of Fact determines liability for the Negligent Hiring claim, economic losses
324          would include all investment losses (investments less returns) for Soft Investors from the
325          engagement date of February 28, 2000, until the collapse of the Ponzi scheme on October
326          12, 2011. This is to put the investor in the same place economically they would have been
327          in "but for" the Agency Agreement. In other words, these investors would never have
328          invested.

329    If the Trier of Fact finds Negligent Supervision or Retention, economic losses sustained by the
330    Soft Investors would only include investment losses after the Negligence Date. This is to put the
331    investor in the same place economically that they would have been at that date had Union
332    Central terminated the agency relationship, and they had not invested until after that date.

333    **Solid Investors**

334    As detailed above, according to the available PAT investor questionnaires, 93.1% of the 217
335    responding PAT Members, or 202 PAT Members, approached the Randall Enterprise with
336    intentions to make an investment. These 202 PAT Members include investors who invested with
337    Horizon as early as 1996, prior to the Agency Agreement. This evidence indicates to me,
338    consistent with other Ponzi schemes both involving insurance agents and without, that these
339    investors would have invested or continued to invest with the Randall Enterprise based on the
340    investment offerings, regardless of the Agency Agreement.

341    For this category of investors, because their investments do not appear to be reliant on the
342    Randall Enterprise's relationship with Union Central, the Solid Investors' investment losses do
343    not begin until the Randall Enterprise would have collapsed as a result of Union Central's
344    alleged negligence, which is described above and in Opinion 4 as the Hypothetical Collapse
345    Date. In other words, the damage date related to any of the three negligence claims for these
346    investors would not start until the scheme actually collapsed, because their investment was not
347    related to Union Central's engagement, but rather the loss they suffered, if attributable to Union
348    Central's actions, would only have been affected by Union Central's Alleged Wrongful Conduct
349    not causing the scheme to actually collapse at an earlier date.



350    The following graphics represent the appropriate loss calculation methodology for each of these

351    groups given the different negligence scenarios.



352



353

**Policy Dates**

355    Similar to the calculations of economic losses related to the Soft Investors' investments, the

356    dates on which certain Union Central insurance policies were purchased, specifically in

357  relationship to the negligence dates, is necessary to determine the "but for" position of the policy
358  holders and their resultant economic losses related to their payments on those policies.

359  This "but for" analysis would include calculating premium payments of premium amounts and/or
360  partial payment amounts that meet the following criteria:

361          (1) The policy purchased was in excess of the policyholder's life insurance needs or
362          was inappropriate based on their financial circumstances;

363          (2) The premium paid exceeded what would have been paid for appropriate coverage;
364          and

365          (3) The policy was terminated solely based on the failure of the scheme.

366  As with the investment loss calculations, these criteria must be measured on an individual
367  investor or in this case policyholder basis. For example, if a policyholder would have purchased
368  the same policy from another insurance company, the liability of Union Central for collecting
369  that premium would not be related to its Alleged Wrongful Conduct and the policyholder would
370  have suffered no loss. In fact, a review of investor questionnaires indicates that certain investors
371  had policies with other insurance agencies or obtained policies with other agencies and utilized
372  the Randall Enterprise investment only as means to cover the premium payments of the policy
373  with the other insurance company.

374  Due to the lack of sufficient data available and the number of variables required to answer each
375  of the criteria identified above for each PAT investor on a policyholder by policyholder basis, I
376  do not believe it is possible to calculate a reasonable economic loss of the PAT investors related
377  to insurance premiums.

378  To make an appropriate calculation, would require the consultation of an insurance expert to
379  evaluate each policyholder and policy, and determine the proper policy amounts and
380  corresponding premiums. The economic loss would then be calculated, similar to the Soft
381  Investor losses, based on calculated premium losses after the negligence date.

382  The following graphic represents the appropriate economic loss calculation methodology for the



383    insurance premium losses given the different negligence scenarios.



384

**OPINION 4: The available data in the case is insufficient to determine a reasonable date**
**the scheme would have collapsed as a result of Union Central's alleged negligence or that**
**such a collapse would even occur prior to the date of actual collapse of the scheme when the**
**Trustee caused all of the Randall Entities to file bankruptcy on October 12, 2011.**

385
386
387
388

389    Determining a hypothetical date of a Ponzi scheme's failure depends on a number of variables

390    and is based on both the Ponzi scheme facilitator's ability to find additional cash inflows as well

391    as his ability to delay payments of principal and interest to current investors until alternative

392    sources can yield additional cash flow.

393    In my experience, Ponzi scheme operators often, if not in all cases, employ various techniques

394    which enable their Ponzi schemes to continue for a period of time when faced with shortfalls in

395    cash, changes in economic conditions, and regulatory investigations. The period of time over

396    which these tactics might extend the life of a Ponzi scheme can vary from as little as a few

397    months to, in some cases, a "full" recovery sufficient to allow the scheme to continue for many



398     years into the future. Examples of these tactics include the following: [22]

399       •  Inducing investors to roll investments over or re-invest into investments rather than
400         taking cash withdrawals;

401       •  Inducing investors to reinvest interest payments, adding to their principal amounts, rather
402         than taking regular cash disbursements;

403       •  Offering new investments with higher rates of return or fictitious guarantees;

404       •  Requiring additional lead time to cash out principal amounts;

405       •  Delaying interest and principal payments for a period until the related investment
406         recovers;

407       •  Finding new investors or other sources of funds;

408       •  Utilizing hard money lenders;

409       •  Finding new referral sources for new investors; and

410       •  Claiming to find new investment opportunities that will generate high returns

411     Conversely, it is not my experience that Ponzi operators give up when they lose a potential
412     funding source or source of referrals. Rather, my experience indicates that Ponzi operators give
413     up when either their assets are frozen by regulators; investors force the Ponzi operator to file for
414     bankruptcy; or the operator has tried some or all of the items listed above and has reached a point
415     where there is nothing more the Ponzi operator can reasonably do to keep the scheme from
416     collapsing.

417     The evidence in this case demonstrates that, at some point prior to the summer of 2009, Mr.
418     Randall began to employ many of these very tactics to prolong the scheme.[23] Mr. Randall began
419     sending letters to his investors, which included references to his efforts and success in delaying

---

[22]Although many of these tactics are based on my own experience, the SEC's website also mentions many of these same tactics and factors that can delay the collapse of a scheme (Ref: https://www.sec.gov/fast-answers/answersponzihtm.html)
[23] Letter to Investors (Spring 2009), PATTRUST0019739



420 payments, developing and offering new investments, finding new sources for cash flow, and
421 enticing investors to forgo cash interest payments by adding those payments instead to their
422 principal amounts.[24]

423 These letters show an apparent adept, but not an uncommon, ability for an individual running a
424 fraud scheme to keep investor funds in the scheme despite cash-flow issues. As Mr. Randall
425 states in a letter on January 5, 2011, 92% of his investors were interested in keeping their
426 investments with Horizon.[25] This is remarkable even after the cash shortages experienced for
427 what appears to be over two years.

428 Quotes from Mr. Randall's letters include:

429 Early-Mid 2009: "Thank you again for your patience these last few months as we have
430 been later with your interest payments. We believe we are getting the cash flow issues
431 resolved…. Several of you have since asked us about the investment opportunities
432 available…Horizon Financial Center I: This is a real estate secured investment. This is a
433 registered securities[sic]. The first 30 blocks sold will earn a fifteen percent annual
434 return. The remaining 59 blocks sold will earn a seven and three fourths percent annual
435 return…. Maple Heights Townhomes: (Available May 30th)…MCS Auto Sales
436 Dealership.... This will be available in the summer of 2009 and terms are to be
437 determined."[26]

438 September 3, 2009: "Since the meeting we have made good progress in pulling our cash
439 from some of our project or having loans due paid back to us…. We still feel very
440 confident we will be able to bring interest current in September…. Going forward we will
441 be back on track with little if any delay."[27]

442 November 18, 2009: "As you know we have yet to resolve our cash flow issues…we
443 have secured a credit line against assets that we have…. We are confident with the long

[24] Letters to Investors 2009 through 2011, PATTRUST0019739 - PATTRUST0019746
[25] Letter to Investors (January 5, 2011), PATTRUST0019743
[26] Letter to Investors (early 2009), PATTRUST0019739
[27] Letter to Investors (September 3, 2009), PATTRUST0019740



term stability of the companies. We just need to get past the cash flow issue."[28]

March 31, 2010: "We are confident we will be in a position to send your monthly interest each month going forward…. Please review each choice, choose one…A. Please take my October, November, December, January, February, March, and April payment and add it to my balance, also add the equivalent of one month's interest to my balance as a bonus…B. Please pay my October November, December, January, February, March and April interest payments to me in December 2010."[29]

January 5, 2011: "I have been able to meet and speak with almost all of you…. over 92% of you have expressed a strong desire to leave your investment with the Horizon Group of Companies…. It will be difficult for us to pay interest for the next 90 days"[30]

February 16, 2011: "We will resume interest payments in April and we will start interest and principle[sic] payments to you in June."[31]

Mr. Randall's actions beginning in early 2009 delayed a potential collapse of the scheme until the Trustee caused the Randall Enterprise entities to file bankruptcy on October 12, 2011("Actual Collapse"), demonstrating that Mr. Randall had the ability to continue the scheme, for at least a time, when faced with difficulties and cash flow shortages.

The actual time-period over which Mr. Randall may have actually been able to continue the scheme given any number of circumstances and points in time, is not apparent and would be incalculable given the many variables, including economic factors, that would have to be considered.[32]

Consistent with these facts, Mr. Miller's report does not indicate a date or hypothetical date that the scheme would fail absent the Agency Agreement. Importantly, the report does not provide any date on which it could reasonably be determined that the scheme would fail in the absence of

[28] Letter to Investors (November 18, 2009), PATTRUST0019741
[29] Letter to Investors (May 31, 2010), PATTRUST0019742
[30] Letter to Investors (January 5, 2011), PATTRUST0019743, PATTRUST0019744
[31] Letter to Investors (February 16, 2011), PATTRUST0019746
[32] This includes considering periods in time, such as 2000 – 2001, when Horizon had sufficient alternative inflows of cash to pay investor interest and principal payments without reliance on new investor funds (See Opinion 2)



or after termination of the Union Central agency agreement. While Mr. Miller describes at length, but generally, the importance of Horizon Financial to the Randall Enterprise, his use of the word "likely" in discussing the collapse or exposure of the scheme demonstrates his acknowledgement that this date is indeterminable with any level of reasonable certainty. Mr. Miller's statements are as follows:

> "But for the influx of investor cash being directed Randall's way by the [Horizon Financial] Union Central agents, his scheme would *likely* have been exposed and collapsed much earlier" [emphasis added].[33]

> "…without the revenues Horizon Insurance generated from commissions on insurance sales, the Randall Enterprise would *likely* have collapsed from the inability to pay its operating expenses and make payments to investors" [emphasis added].[34]

It has not been established from any of the data in the case, financial or otherwise, that the Randall Enterprise would have collapsed at any date earlier than its Actual Collapse. In the first quote cited above, Mr. Miller references likely "exposure" of the scheme, which ignores the fact that other third parties had reviewed the same and/or more detailed financial information at various points during the scheme, without resulting in the scheme's exposure or collapse.[35]

As mentioned previously, Ponzi scheme operators will take extraordinary steps, including making false statements and creating fictitious documents, to hide the truth of their scheme from investigators, investors, regulators, and others. As is the case with Mr. Randall, he employed various techniques to fool investors, regulators, auditors, and others, allowing his scheme to continue during periods of time when his financial situation was in question, including making false statements and fabricating financial documents and support.[36]

Further, as is the fact in this case, the Randall Enterprise operations as a Ponzi scheme was not readily apparent until Mr. Randall filed bankruptcy, the U.S. Trustee's office appointed Mr.

---

[33] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 6
[34] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 6
[35] This includes investors, independent and licensed CPA auditors, and government regulators
[36] This includes various documents supporting the audit performed by Stayner Bates, investor prospectus, and documents and financial statements provided to Union Central.



Miller as Trustee of the Randall Enterprise, and Mr. Miller was able to closely review the financial statements and transactions of the company, determining later that it was exhibiting the characteristics of a Ponzi scheme and that those activities were intertwined among various Randall entities, requiring their consolidation.[37]

Thus, the determination of a reasonably reliable date of collapse of the Randall Enterprise Ponzi scheme is not possible, eliminating the ability of a damage expert to conclude the date upon which to calculate the "but for" economic position of the categorized Solid Investors.

**OPINION 5: The victim loss calculation in Mr. Miller's report is not calculated using an appropriate methodology. The methodology and calculations are inconsistent with the facts of the case and contain errors.**

The methodology used to measure losses in Mr. Miller's report is not a conventional method of measuring economic losses for a case such as this, such as the standard methodologies described in various texts, which I have described above in Opinion 3.

While no particular text is believed to be authoritative, the excerpts from the Litigation Services Handbook and AICPA Practice Aids, referenced in Opinion 3 above, include the requirement to measure economic losses using a "but for" analysis method and ensuring the loss calculated is a reflection of the actual economic losses at question in the matter. This is fair representation of what is accepted practice in measuring economic losses in this type of a case.

The calculation methodology used by Mr. Miller to determine the "summary of victim loss" totaling $32,359,045, is typically performed, appropriate, and approved by the many courts, as mentioned in Mr. Miller's report, for use in calculating total "investment losses" and "investor claims" for victims of a Ponzi scheme.[38] This calculation methodology is often used to determine the total loss of the investors regardless of liability in the case, and would only be appropriate to use when determining total investment losses for the Ponzi scheme, such as determining total restitution amounts to be paid by the individual responsible for running the Ponzi scheme.

---

[37] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 3
[38] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 16 and footnote 47



516 Reliance on the loss calculation methodology used in Mr. Miller's report would be appropriate if
517 the damage award was meant to place the PAT members in the same economic position they
518 would have been, if:

519     1) Mr. Randall never began operation of a Ponzi scheme; or

520     2) The investors never invested in the Randall Enterprise.

521 However, the claims in this case are related to specific Alleged Wrongful Conduct which is
522 based on the Agency Agreement and association of the Randall Enterprise with Union Central.
523 Each of the acts in question are or must be associated with specific dates and the economic
524 consequences of certain events in order to perform proper economic loss calculations.

525 In my opinions 3 and 4 above I have described methods and considerations that must be
526 accounted for to appropriately calculate economic losses in this matter. In sum, I have reviewed
527 the calculations and methodology in Mr. Miller's report, and found that the methodology and
528 resulting calculations contradict the facts in the accounting data and other pertinent and available
529 information in the case. These contradictions include the following:

530     1) The calculation includes losses for investors who invested prior to the Agency
531         Agreement. The calculation includes investors from as early as June 1996, over 3.5
532         years prior the engagement of the Union Central via the Agency Agreement.

533     2) The methodology does not identify the investors who only invested in the Randall
534         Enterprise because of the Union Central relationship, but has rather included all
535         investors.

536     3) The calculation is not based on an established date the Union Central agreement would
537         have been terminated (or not entered into). I would expect to see at least two dates:
538         February 28, 2000 for the negligent hiring claim and some later date of termination for
539         the negligent supervision and negligent retention claims. These dates would each
540         require a separate calculation.

541     4) The methodology used has established neither (1) that the Randall Enterprise would
542         collapse absent the Agency Agreement nor (2) the time frame or date for when Ponzi
543         would hypothetically collapse absent the Union Central relationship. In fact, the report
544         only states the scheme would "likely" fail or be "exposed" earlier.



545     5)  The calculation does not reflect or place the PAT members in an accurate or reasonable

546         economic position, absent the Union Central agency agreement and/or "but for" the

547         defendant's alleged conduct.

548     6)  The calculations in the report contains certain errors, specifically related to calculations

549         of insurance premium payments, including:[39]

550         A.    Double-counting certain insurance premium payment amounts

551         B.    Including certain Term Policy premium payment amounts

552         C.    Including certain premium amounts related to active policies; and

553         D.    Ignoring certain policy amounts on terminated policies that should be

554            included given his methodology

555

**556 OPINION 6: Mr. Miller has not provided calculations for the economic loss attributable to**
**557 the Negligent Hiring, Negligent Supervision, and Negligent Retention claims.**

558 When a plaintiff claims to have suffered from multiple causes of action by the defendant (as in

559 this matter), it is not uncommon for those claims to result in various distinct economic

560 consequences.  In matters involving various claimed acts, the Alleged Wrongful Conduct is

561 typically analyzed by the damage expert in order to identify the number of "distinct economic

562 consequences" that are likely to have occurred as a result of the various claims being made.

563 A "distinct economic consequence" refers to an economic impact caused by one of the

564 defendant's alleged wrongful acts that is a different consequence than the financial impact

565 caused by a different alleged act of wrongful conduct. For example, in this case, an investor loss

566 resulting from Union Central not entering into the Agency Agreement on February 28, 2000 and

567 the investor loss resulting from Union Central not terminating the agency agreement on, for

568 example January 1, 2002, or January 1, 2009, are all events that are expected to have different

569 economic consequences to each PAT investor.  If different acts are most reasonably expected to

570 have a different economic consequence than other claimed acts, economic losses are

571 conventionally segregated so that there is a separate calculation for any Alleged Wrongful

---

[39] For convenience, I have provided a schedule recalculating the investor premium loss in Mr. Miller's report, which details by policyholder the errors in the calculations. See Schedules 4.1 and 4.2.



Conduct that has a unique economic consequence.[40]  Two different economic loss amounts are typically calculated in order to provide the Finder of Fact with a basis for measuring economic losses in the event the Defendant is found liable for only one of the claimed consequences.

The calculations contained in Mr. Miller's report offer only one calculation and, based on the dates of the calculations and/or lack of identification of different dates or resultant economic consequences that would be associated with any other dates, I cannot see that the calculation provided is an economic loss calculation that is specific or could be applied to any of the three negligence claims.

Thus, if the trier of fact finds for the Plaintiff on any of the three negligence claims, Mr. Miller has not provided any economic loss calculation.

**OPINION 7: If the trier of fact finds for the Plaintiff and also determines a date on which damages actually occurred, the loss related to any negligence attributable to Union Central is, at most, between $0 and $961,923 in investment losses for Soft Investors and, at most, between $0 and $1,757,989 in PAT Member investor premium losses.**

Below, I have utilized the methodology described in my opinions 3 and 4 above to estimate the economic consequences the PAT Members suffered, assuming the Finder of Fact determines Union Central behaved wrongfully.

Because the Negligence Date and Hypothetical Collapse Date cannot be or have not been provided by the plaintiff or Mr. Miller, I have provided a rolling calculation of potential economic losses should the Trier of Fact conclude negligence occurred and a reasonable date on which to calculate economic losses is determined.

**INVESTMENT LOSSES**

I began my calculations utilizing Mr. Miller's Exhibit 10 as a basis for determining PAT Member investments and returns, which already includes, as Mr. Miller references in his report, returns made to investors based on the Trustee's efforts.[41]

---

[40] In some instances, the difference in damages is considered immaterial or impractical and therefore separate calculations may not be performed.

[41] Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, p. 16



I then reviewed the PAT Member information and data to identify "Soft Investors" and excluded "Solid Investors" from my calculation. This resulted in investor losses for 15 investors ranging from $961,923 beginning February 2000, and $0 if it is determined the scheme would not have collapsed until its Actual Collapse on October 12, 2011. Schedule 1 reflects a rolling investment loss calculation by date. Schedule 2 contains a PAT Member loss summary that is alphabetical by last name.

**INSURANCE PREMIUM LOSSES**

I have also recalculated Mr. Miller's insurance premium losses, accounting for the errors noted in my opinion 5. Although I do not agree with the soundness of the calculation and methodology utilized in Mr. Miller's calculation, I felt it prudent to provide a properly calculated number following his methodology. The total loss associated with these premium payments under this methodology would range from $0 to $1,757,989, depending on the ultimate determination of the Negligence Date.[42] A detailed listing of these losses is located in Schedules 3 and 4.

Respectfully Submitted,

James T. Wood, CPA/CFF, CFE
Principal

---

[42] On July 18, 2017, a "Joint stipulation to dismiss the claims of certain members of the PAT" was filed with the court. I have excluded these claims from my calculations; however, the insurance premium loss calculation, if these dismissed claims are included is $2,237,790 (See Schedule 4.1).



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Documents Relied Upon**                                                  **Appendix A**

1   *Miller v. Union Central Life Insurance Company, et al.*, Case. No. 2:14-cv-00575, (Complaint, Aug. 5, 2014) (D. Utah);

2   Report and Disclosure of Gil A. Miller in Line A, *Miller Trustee of the Randall Victims Private Actions Trust vs. Union Central Life Insurance Company, et al.*, Case No. 2:14-cv-00575, including attached exhibits

3   Reports and Declarations by Trustee's expert, John Curtis, in Miller v. Union Central Life Insurance Company, et al., Case. No. 12-02385 and Case No. 13-02023, including attached exhibits

4   Stayner & Associates, LLC, *Financial Statements for the Years Ended December 31, 2002 and 2001 and Independent Auditors' Report*, Horizon Mortgage and Investment, Inc., March 13, 2003 and May 2, 2003 (not included in exhibits for Curtis reports).

5   Stayner Bates & Jensen, P.C., *Audit Budget for Horizon Mortgage & Investment, Inc.*, Dec. 31, 2008.

6   QuickBooks "Profit & Loss" statements and "Balance Sheets," Horizon Financial & Insurance, Jan. 2003-Dec. 2011;

7   Note Purchase Agreement effective as of August 1, 2005 by and between Horizon Financial & Insurance Group, Inc. and Horizon Mortgage and Investment Inc.;

8   Promissory Note from Horizon Financial to Independent Financial and Investment, Aug. 1, 2005;

9   Sales Contract Agreement – Real Estate (between Horizon Mortgage and Investment, Inc. and Horizon Financial & Insurance Group, Inc. Jun. 30, 2006;

10  Secured Promissory Note from Horizon Financial & Insurance, Inc. and Independent Financial & Investment, Jun. 30, 2006;

11  Appraisal of Real Property located at 1505 W. 1220 North, Layton, Utah, Mar. 17, 2002 and auditor notes;

12  Secured Promissory Note from Horizon Financial & Insurance Group, Inc. and Horizon Mortgage & Investment, Dec. 31, 2008;

13  Fast Answers: Ponzi Schemes, www.sec.gov/fast-answers/answersponzihtm.html.

14  *Forensic & Valuation Services Practice Aid, Forensic Accounting—Fraud Investigations, (AICPA, 2014)*

15  Thomas W. Golden, Teven L. Skalak, and Mona M. Clayton, *A Guide to Forensic Accounting Investigation* Chapter 7, p. 111; p. 13 (Wiley, 2006).

16  *Miller v. Union Central Life Insurance Company, et al.* Case No. 2:14-Cv-00575-Jnp-Pmw, (Plaintiff's Objections And Responses To Defendant's First Set Of Interrogatories, Nov 2, 2015)

17  *Miller v. Union Central Life Insurance Company, et al.*, Case No. 2:14-Cv-00575-Jnp-Pmw, (Plaintiff's First Supplemental Objections And Responses To Defendant's First Set Of Interrogatories, Jun 2, 2016)

18  *Miller v. Union Central Life Insurance Company, et al.*, Case No. 2:14-Cv-00575-Jnp-Pmw, (Plaintiff's Second Supplemental Objections And Responses To Defendant's First Set Of Interrogatories, Apr 26, 2017)

19  *Miller v. Union Central Life Insurance Company, et al.*, Case No. 2:14-Cv-00575-Jnp-Pmw, (Plaintiff's Third Supplemental Objections And Responses To Defendant's First Set Of Interrogatories, Jul 14, 2017)

20  Miller, v. Union Central Life Insurance Company, et al, Case No. 2:14-Cv-00575-Jnp-Pmw, (Joint Stipulation To Dismiss The Claims Of Certain Members Of The Private Actions Trust, Jul 18, 2017)

21  Deposition Transcripts and Exhibits of PAT members:

22      Allen, Russell

23      Allred, Gerald

24      Bradshaw, Mark

25      Clements, Allen

26      Floyd, Cathryn

27      Hooper,Danita

28      Hoyle, Jana

29      Hyer, Alan

30      Peterson, Bryan

31      Reber, Kenneth

32      Robbins, Carl OBO Trapper Trails Council of the Boy Scouts of America

33      Shern, Joseph

34      Strickland, Kirk

35      Tice, Thomas

36  Investor Questionnaires (PATTRUST0174865-PATTRUST0197335)

37  Expert Report and Disclosure of Kent M. Bowman, Case No. 2:14-cv-00575, August 10, 2017

38  AICPA FVS Practice Aid, Discount Rates, Risk, and Uncertainty in Economic Damage Calculations (2013)

39  The Litigation Services Handbook (6th Edition), Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans

40  Letters to Investors 2009 through 2011, PATTRUST0019739 - PATTRUST0019746

41  Union Central Insurance Data (UNION CENTRAL 0404362)

42  Audit workpapers from Stayner Bates for HMI Audit (For years 2001-2009)



*Lone Peak Valuation Group*
**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Curriculum Vitae**                                                      **Appendix B**





# JAMES T. WOOD, CPA/CFF, CFE

36 SOUTH STATE STREET, SUITE 500
SALT LAKE CITY, UT 84111
MAIN: (801) 708-7700
FAX: (801) 708-7701
DIRECT: (801) 321-6350
EMAIL: JWOOD@LPVGROUP.COM

Mr. Wood is a Principal at Lone Peak Valuation Group and specializes in fraud and forensic accounting examinations. He has extensive experience investigating and quantifying losses from Ponzi schemes, embezzlements, mortgage frauds, securities frauds, advance fee schemes, FCPA violations, public corruption, money laundering, check kiting, bankruptcy frauds, and cybercrimes. His previous positions include work as an FBI forensic accountant, where he conducted criminal investigations and supervised the Bureau's Forensic Accountant Support Team, a select group of FBI forensic accountants, based in Washington DC, responsible for conducting highly complex financial investigations across the United States and internationally. In conjunction with his fraud and forensic accounting examinations, Mr. Wood has testified in Federal Court and at Grand Jury proceedings. Mr. Wood also has extensive experience as a college instructor, teaching graduate and undergraduate courses on financial and forensic accounting.

Mr. Wood is a Certified Public Accountant and is Certified in Financial Forensics by the American Institute of Certified Public Accountants. He is also a Certified Fraud Examiner.

## *Professional Experience*

| | |
|---|---|
| 2017 to Present | **Lone Peak Valuation Group**<br>*Principal*<br>Salt Lake City, UT |
| 2016 to 2017 | **StoneTurn Group**<br>*Managing Director*<br>Washington, DC |
| 2010 to 2016 | **Federal Bureau of Investigation**<br>Supervisory Forensic Accountant<br>Washington, DC |
| 2007 to 2010 | **PricewaterhouseCoopers, LLP**<br>*Senior Associate*<br>Salt Lake City, Utah |

## *Teaching Experience*

| | | |
|---|---|---|
| 2015 to 2017 | **American University** | |
| | *Adjunct Instructor* | |
| | Washington, DC | |
| | | |
| 2015 to 2016 | **The George Washington University** | |
| | *Lecturer* | |
| | Washington, DC | |
| | | |
| 2013 to 2014 | **University of Utah** | |
| | *Associate Instructor* | |
| | Salt Lake City, UT | |

## *Education*

Masters of Accounting                                                                 Salt Lake City, Utah
University of Utah, 2008

BS Accounting                                                                           Salt Lake City, Utah
University of Utah, 2007

## PROFESSIONAL CREDENTIALS

Certified Public Accountant (Licensed in Utah), 2009
Certified Fraud Examiner (Association of Certified Fraud Examiners), 2009
Certified in Financial Forensics (American Institute of Certified Public Accountants), 2017

## PROFESSIONAL MEMBERSHIPS

American Institute of Certified Public Accountants
Association of Certified Fraud Examiners

## PRESENTATIONS

*"Forensic Accounting Overview"* FBI New Agent Training, Quantico, VA, Quarterly 2014 – 2016

*"Conducting Financial Investigations"* State Police, Dubai, United Arab Emirates, May 2015

*"Interviewing Techniques"* University of Utah, Salt Lake City, Utah, April 2014

*"Bribery and Corruption Investigations"* National Accountability Bureau, Islamabad, Pakistan, August 2013

## PRIOR TESTIMONY

United States of America v. Robert L. Holloway

*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**PAT Investment Loss and Rolling Economic Loss Calculation**      **Schedule 1**

*Data Source: Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, Exhibit 10*

| Name | Investment and Economic Loss Calculation Date | Invested Amount | Amount Returned | Net Victim Investment Loss By Investment | Rolling Economic Loss by Negligent State |
|---|---|---|---|---|---|
| | 02/28/2000 | | | | $ 961,922.96 |
| Elizondo, Victoria B | 02/10/2003 | $ 10,491.48 | $ 7,461.14 | $ 3,030.34 | 958,892.62 |
| The Boyce Family | 09/29/2003 | 150,000.00 | 104,131.01 | 45,868.99 | 913,023.63 |
| The Boyce Family | 02/18/2004 | 50,000.00 | 32,988.16 | 17,011.84 | 896,011.79 |
| The Boyce Family | 04/26/2004 | 200,000.00 | 128,653.83 | 71,346.17 | 824,665.62 |
| Fujiki, Martin | 08/31/2004 | 10,000.00 | 5,400.78 | 4,599.22 | 820,066.40 |
| Stucki, Dixie | 08/31/2004 | 17,311.43 | 9,045.38 | 8,266.05 | 811,800.35 |
| Stucki, Dixie | 08/31/2004 | 1,685.11 | 880.48 | 804.63 | 810,995.72 |
| Williams, Stephen & Nancy | 09/17/2004 | 25,000.00 | 14,777.03 | 10,222.97 | 800,772.75 |
| Reist, Charles and Virginia | 10/01/2004 | 50,000.00 | 20,938.93 | 29,061.07 | 771,711.68 |
| Condie, Thomas Alan | 11/18/2004 | 41,184.28 | 30,054.75 | 11,129.53 | 760,582.15 |
| Condie, Jean Kendell | 12/31/2004 | 17,486.89 | 8,682.48 | 8,804.41 | 751,777.74 |
| Frodsham, Bret | 04/13/2006 | 120,000.00 | 39,477.76 | 80,522.24 | 671,255.50 |
| Fujiki, Martin | 06/28/2006 | 37,861.53 | 15,054.73 | 22,806.80 | 648,448.70 |
| Kinyon, Jerry | 09/30/2006 | 164,730.87 | 65,739.65 | 98,991.22 | 549,457.48 |
| The Boyce Family | 10/26/2006 | 189,160.00 | 79,789.93 | 109,370.07 | 440,087.41 |
| Stucki, Carl and Karissa | 12/05/2007 | 15,969.55 | 3,654.27 | 12,315.28 | 427,772.13 |
| Stucki, Carl and Karissa | 12/05/2007 | 1,811.26 | 414.47 | 1,396.79 | 426,375.34 |
| Stucki, Carl and Karissa | 12/14/2007 | 1,191.78 | 270.87 | 920.91 | 425,454.43 |
| Reist, Charles and Virginia | 12/11/2008 | 60,000.00 | 9,692.02 | 50,307.98 | 375,146.45 |
| Bladen, B Kent | 03/11/2009 | 73,179.72 | 35,034.07 | 38,145.65 | 337,000.80 |
| Saltas, Terry P | 11/25/2009 | 100,000.00 | 20,552.39 | 79,447.61 | 257,553.19 |
| Fisher, Randy | 02/17/2011 | 60,000.00 | 15,317.11 | 44,682.89 | 212,870.30 |
| Fisher, Randy | 04/07/2011 | 100,000.00 | 17,901.10 | 82,098.90 | 130,771.40 |
| Day, Brandi | 07/13/2011 | 165,692.56 | 34,921.16 | 130,771.40 | - |
| | | | | $ 961,922.96 | |



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

PAT Investment Loss By Investor

*Data Source: Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, Exhibit 10*

| Name from Investors | Amount Invested | Amount Returned | Net Investment Lost |
|---|---|---|---|
| Bladen, B Kent | $ 73,179.72 | $ 35,034.07 | $ 38,145.65 |
| Condie, Jean Kendell | 17,486.89 | 8,682.48 | 8,804.41 |
| Condie, Thomas Alan | 41,184.28 | 30,054.75 | 11,129.53 |
| Day, Brandi | 165,692.56 | 34,921.16 | 130,771.40 |
| Elizondo, Victoria B | 10,491.48 | 7,461.14 | 3,030.34 |
| Fisher, Randy | 160,000.00 | 33,218.21 | 126,781.79 |
| Frodsham, Bret | 120,000.00 | 39,477.76 | 80,522.24 |
| Fujiki, Martin | 47,861.53 | 20,455.51 | 27,406.02 |
| Kinyon, Jerry | 164,730.87 | 65,739.65 | 98,991.22 |
| Reist, Charles and Virginia | 110,000.00 | 30,630.95 | 79,369.05 |
| Saltas, Terry P | 100,000.00 | 20,552.39 | 79,447.61 |
| Stucki, Carl and Karissa | 18,972.59 | 4,339.61 | 14,632.98 |
| Stucki, Dixie | 18,996.54 | 9,925.86 | 9,070.68 |
| The Boyce Family | 589,160.00 | 345,562.93 | 243,597.07 |
| Williams, Stephen & Nancy | 25,000.00 | 14,777.03 | 10,222.97 |
| | | $ | 961,922.96 |



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Net Premium Economic Loss Calculation**                                    Schedule 3

*Data Source: Union Central Insurance Data (UNION CENTRAL 0404362)*

| Name | Net Premium Lost |
|------|------------------:|
| Allred, Geri L | $ 9,407.44 |
| Anderson, Nancy | 72,076.01 |
| Bergenthal, Kenneth | 243,506.72 |
| Bladen, B Kent | 189,101.32 |
| Brown, James Terry | 27,279.36 |
| Clements, Allen G | 7,879.49 |
| Crowl, Nancy A | 23,687.22 |
| Crowl, William D | 46,328.76 |
| Currey, Julia | 25,842.16 |
| Elizondo, Victoria B | 83,885.67 |
| Farnes, Loree D | 20,014.98 |
| Fluckiger, Blaine | 33,800.14 |
| Fluckiger, Debra | 20,223.37 |
| Frodsham, Bret | 58,840.96 |
| Frodsham, Kristi | 32,713.60 |
| Gelter, Aaron | 5,133.23 |
| Goss, Tyson | 38,232.68 |
| Handy, Joan | 13,255.00 |
| Hansen, Wayne | 74,733.65 |
| Hooper, Danita | 80,322.97 |
| Jaggi, Allen | 113,236.53 |
| Jaggi, Heidi B | 9,345.84 |
| Jens Nicholas Alexander Dienst Irrevocable Trust | 7,299.00 |
| Maughan, Josiah | 6,378.21 |
| Milne, Robert Brent | 143,988.81 |
| Nichol, Gerald | 77,717.50 |
| Pendleton, Mitchell K | 20,627.40 |
| Petersen, Donald R | 10,185.75 |
| Saltas, Terry P | 8,650.12 |
| Savage, Brett | 29,896.35 |
| Squire, Curtis E | 16,719.03 |
| Squire, Tina S | 12,076.34 |
| Stinger, Janalee | 17,800.50 |
| Stokes, Norma | 55,777.68 |
| Tice, Ava A | 36,720.00 |
| Tice, Thomas C | 45,769.84 |
| Vigil, Geneil | 18,535.55 |
| Vigil, Gerald | 21,000.00 |
| | **$ 1,757,989.18** |



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Adjusted Net Premium Loss and Rolling Adjusted Net Premium Loss**

*Data Sources: Union Central Insurance Data (UNION CENTRAL 0404362)*

| Name | Policy Number | Date of Policy | Adjusted Net Premium Lost | RollingNet Premium Loss by Negligent State |
|---|---|---|---|---|
| | | 02/28/2002 | | $ 1,757,989.18 |
| Brown, James Terry | L000007436 | 08/02/2002 | $ 27,279.36 | 1,730,709.82 |
| Elizondo, Victoria B | L000007770 | 11/15/2002 | 56,848.65 | 1,673,861.17 |
| Milne, Robert Brent | L000008327 | 03/15/2003 | 143,988.81 | 1,529,872.36 |
| Stokes, Norma | L000009141 | 09/22/2003 | 55,777.68 | 1,474,094.68 |
| Elizondo, Victoria B | L000010392 | 04/15/2004 | 9,646.82 | 1,464,447.86 |
| Bergenthal, Kenneth | L000009998 | 04/25/2004 | 157,850.00 | 1,306,597.86 |
| Nichol, Gerald | L000011078 | 07/08/2004 | 77,717.50 | 1,228,880.36 |
| Hansen, Wayne | L000011335 | 10/20/2004 | 74,733.65 | 1,154,146.71 |
| Savage, Brett | L000010733 | 11/01/2004 | 29,896.35 | 1,124,250.36 |
| Elizondo, Victoria B | L000011611 | 11/15/2004 | 17,390.20 | 1,106,860.16 |
| Anderson, Nancy | L000011375 | 01/26/2005 | 18,922.56 | 1,087,937.60 |
| Jaggi, Allen | L000013264 | 10/26/2005 | 83,312.69 | 1,004,624.91 |
| Jaggi, Jane | L000013265 | 10/26/2005 | 17,763.13 | 986,861.78 |
| Crowl, Nancy A | L000013632 | 12/08/2005 | 23,687.22 | 963,174.56 |
| Crowl, William D | L000013631 | 12/08/2005 | 46,328.76 | 916,845.80 |
| Tice, Thomas C | L200000046 | 01/31/2006 | 36,720.00 | 880,125.80 |
| Tice, Ava A | L200000045 | 01/31/2006 | 36,720.00 | 843,405.80 |
| Frodsham, Bret | L200000313 | 04/05/2006 | 58,840.96 | 784,564.84 |
| Frodsham, Kristi | L200000314 | 04/05/2006 | 32,713.60 | 751,851.24 |
| Maughan, Josiah | L200000384 | 05/04/2006 | 6,378.21 | 745,473.03 |
| Farnes, Loree D | L200000662 | 08/03/2006 | 20,014.98 | 725,458.05 |
| Anderson, Nancy | L200001412 | 08/29/2006 | 41,797.86 | 683,660.19 |
| Anderson, Nancy | L200001413 | 09/29/2006 | 11,355.59 | 672,304.60 |
| Currey, Julia | L200002408 | 04/10/2007 | 25,842.16 | 646,462.44 |
| Clements, Allen G | L200004343 | 09/22/2007 | 7,879.49 | 638,582.95 |
| Vigil, Geneil | L200003916 | 10/01/2007 | 18,535.55 | 620,047.40 |
| Vigil, Gerald | L200003915 | 10/01/2007 | 21,000.00 | 599,047.40 |
| Hooper, Danita | L200004709 | 11/21/2007 | 13,500.27 | 585,547.13 |
| Hooper, Danita | L200004706 | 11/25/2007 | 15,011.76 | 570,535.37 |
| Hooper, Danita | L200004707 | 11/25/2007 | 17,252.95 | 553,282.42 |
| Hooper, Danita | L200004708 | 11/25/2007 | 19,546.23 | 533,736.19 |
| Hooper, Danita | L200004710 | 11/25/2007 | 15,011.76 | 518,724.43 |
| Bergenthal, Kenneth | L200005423 | 01/10/2008 | 85,656.72 | 433,067.71 |
| Tice, Thomas C | L200005997 | 02/28/2008 | 9,049.84 | 424,017.87 |
| Allred, Geri L | L200005863 | 03/03/2008 | 9,407.44 | 414,610.43 |
| Petersen, Donald R | L200005901 | 05/06/2008 | 10,185.75 | 404,424.68 |
| Jaggi, Heidi B | L200006187 | 05/14/2008 | 9,345.84 | 395,078.84 |
| Squire, Curtis E | L200006427 | 05/15/2008 | 16,719.03 | 378,359.81 |
| Squire, Tina S | L200006425 | 05/15/2008 | 12,076.34 | 366,283.47 |
| Pendleton, Mitchell K | L200006403 | 07/16/2008 | 20,627.40 | 345,656.07 |
| Fluckiger, Blaine | L200006694 | 07/20/2008 | 33,800.14 | 311,855.93 |
| Fluckiger, Debra | L200006696 | 07/20/2008 | 20,223.37 | 291,632.56 |
| Bladen, B Kent | L200008376 | 03/21/2009 | 189,101.32 | 102,531.24 |
| Jens Nicholas Alexander Dienst Irrevocable Trust | L200008374 | 04/28/2009 | 7,299.00 | 95,232.24 |
| Goss, Tyson | L200009599 | 10/01/2009 | 38,232.68 | 56,999.56 |
| Jaggi, Allen | L200010333 | 10/15/2009 | 12,160.71 | 44,838.85 |
| Handy, Joan | L200010673 | 11/03/2009 | 13,255.00 | 31,583.85 |
| Saltas, Terry P | L200010064 | 12/09/2009 | 8,650.12 | 22,933.73 |
| Gelter, Aaron | L200011179 | 01/05/2010 | 5,133.23 | 17,800.50 |
| Stinger, Janalee | L200011705 | 05/20/2010 | 17,800.50 | - |
| | | | $ 1,757,989.18 | |



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Premium Loss Calculation**                                                        **Schedule 4.1**

*Data Sources:*
*<1>  Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, Exhibit 10*
*<2>  Union Central Insurance Data (UNION CENTRAL 0404362)*

| Name | <1> Net Premium Lost Per Miller Report | <2> Adjusted Net Premium Lost | Amount of Error | |
|---|---|---|---|---|
| Adams, Donald | $ 40,304.65 | $ - | $ 40,304.65 | [c] |
| Allred, Geri L | 18,814.88 | 9,407.44 | 9,407.44 | [a] |
| Anderson, Nancy | 53,153.45 | 72,076.01 | (18,922.56) | [a] |
| Baker, Jesse Wayne | 31,334.00 | 31,334.00 | - | [d] |
| Barratt, Craig and Sheri | 9,840.96 | - | 9,840.96 | [a] |
| Bennett, A Gary | 32,631.33 | - | 32,631.33 | [b] |
| Bergenthal, Kenneth | 139,980.12 | 243,506.72 | (103,526.60) | [a] |
| Bird, Gary A | 52,230.00 | - | 52,230.00 | [c] |
| Bladen, B Kent | 756,405.28 | 189,101.32 | 567,303.96 | [a] |
| Bladen, Christine M | 21,648.00 | - | 21,648.00 | [a] |
| Bradshaw, Mark | 196,446.74 | - | 196,446.74 | [b] |
| Brown, James Terry | - | 27,279.36 | (27,279.36) | [a] |
| Clements, Allen G | 36,177.54 | 7,879.49 | 28,298.05 | [a] |
| Conger, L Reed | 91,250.00 | 91,250.00 | - | [d] |
| Crowl, Nancy A | 47,374.44 | 23,687.22 | 23,687.22 | [a] |
| Crowl, William D | 92,657.52 | 46,328.76 | 46,328.76 | [a] |
| Currey, Julia | - | 25,842.16 | (25,842.16) | [a] |
| Day, Brandi | 17,818.00 | - | 17,818.00 | [b] |
| Dover, Patrick A | 11,982.40 | 187,907.16 | (175,924.76) | [a], [d] |
| Elizondo, Victoria B | - | 83,885.67 | (83,885.67) | [a] |
| Equitrust Life Insurance Company | 8,446.37 | 6,675.02 | 1,771.35 | [a], [d] |
| Farnes, Loree D | 40,029.96 | 20,014.98 | 20,014.98 | [a] |
| Fluckiger, Blaine | 54,023.51 | 33,800.14 | 20,223.37 | [a] |
| Fluckiger, Debra | | 20,223.37 | (20,223.37) | [a] |
| Fonnesbeck, Chris J | 5,090.00 | - | 5,090.00 | [a] |
| Frodsham, Bret | 366,218.24 | 58,840.96 | 307,377.28 | [a] |
| Frodsham, Kristi | | 32,713.60 | (32,713.60) | [a] |
| Gelter, Aaron | 5,563.37 | 5,133.23 | 430.14 | [a] |
| Gibson, Brent | 14,554.86 | - | 14,554.86 | [a] |
| Gilbert, John | 1,389.08 | - | 1,389.08 | [a] |
| Gledhill, Brent | 18,778.88 | - | 18,778.88 | [a] |
| Goss, Tyson | 76,465.36 | 38,232.68 | 38,232.68 | [a] |
| Haas, Jr Paul F | 10,589.76 | - | 10,589.76 | [a] |
| Handy, Joan | 30,765.75 | 13,255.00 | 17,510.75 | [a] |
| Hansen, Shane L | 10,553.81 | 10,553.81 | - | [d] |
| Hansen, Wayne | - | 74,733.65 | (74,733.65) | [a] |
| Hiatt, Julie | 23,947.84 | - | 23,947.84 | [a] |
| Hooper, Danita | 80,322.97 | 80,322.97 | - | |
| Jaggi, Allen | 113,236.53 | 113,236.53 | - | |
| Jaggi, Heidi B | 9,345.84 | 9,345.84 | - | |
| Jens Nicholas Alexander Dienst Irrevocable Trust | 14,164.00 | 7,299.00 | 6,865.00 | [a] |
| Killpack, Bevan D | 124,792.92 | - | 124,792.92 | [a] |
| Leavitt, Jack | 36,000.00 | - | 36,000.00 | [b] |
| Lueders, Edward | 631.24 | - | 631.24 | [b] |
| Maughan, Josiah | 6,655.00 | 6,378.21 | 276.79 | [a] |
| Milne, Robert Brent | 143,989.00 | 143,988.81 | 0.19 | [a] |
| Morgan, Gary B | 10,452.14 | - | 10,452.14 | [a] |
| Myers, Darin R. | 1,862.80 | - | 1,862.80 | [a] |



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Premium Loss Calculation**                                                                    **Schedule 4.1**

Data Sources:
<1>  Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, Exhibit 10
<2>  Union Central Insurance Data (UNION CENTRAL 0404362)

| Name | <1> Net Premium Lost Per Miller Report | <2> Adjusted Net Premium Lost | Amount of Error | |
|------|---:|---:|---:|---|
| Nichol, Gerald | - | 77,717.50 | (77,717.50) | [a] |
| Pederson, Justin | 2,919.62 | - | 2,919.62 | [a] |
| Pendleton, Mitchell K | - | 20,627.40 | (20,627.40) | [a] |
| Petersen, Donald R | 10,185.75 | 10,185.75 | - | |
| Pope, Lorenzo | 107,795.23 | 83,051.28 | 24,743.95 | [a], [d] |
| Rawlings, Gennifer | 844.35 | - | 844.35 | [a] |
| Rawlings, Jody and Gennifer | 16,762.18 | - | 16,762.18 | [a] |
| Rowberry, Paul & Janice | 5,616.00 | - | 5,616.00 | [a] |
| Saltas, Terry P | 8,650.12 | 8,650.12 | - | |
| Samara Alexis Alina Dienst Irrevocable Trust | 14,164.00 | - | 14,164.00 | [a] |
| Savage, Brett | 8,260.98 | 29,896.35 | (21,635.37) | [a] |
| Shern, Joseph C | 1,069.46 | - | 1,069.46 | [a] |
| Smith, Jonathan | 43,169.82 | - | 43,169.82 | [a] |
| Smith, Matt M and Tonya C | 6,444.80 | - | 6,444.80 | [a] |
| Squire, Curtis E | 66,664.39 | 16,719.03 | 49,945.36 | [a] |
| Squire, Tina S | | 12,076.34 | (12,076.34) | [a] |
| Stinger, Janalee | 17,800.50 | 17,800.50 | - | |
| Stocker, Randal | 6,963.52 | - | 6,963.52 | [a] |
| Stokes, Norma | 6,924.00 | 55,777.68 | (48,853.68) | [a] |
| Bell, Theodore | 55,785.12 | 55,785.12 | - | [d] |
| Tice, Thomas C | 169,846.14 | 45,769.84 | 124,076.30 | [a] |
| Tice, Ava A | | 36,720.00 | (36,720.00) | [a] |
| Torres, Dana | 5,598.41 | 4,170.61 | 1,427.80 | [a], [d] |
| Weaver, Scot D | 11,046.72 | 9,074.22 | 1,972.50 | [a], [d] |
| Vigil, Geneil | 39,536.00 | 18,535.55 | 21,000.45 | [a] |
| Vigil, Gerald | 18,535.55 | 21,000.00 | (2,464.45) | [a] |
| Watson, Troy G. and Kalynn | 26,050.08 | - | 26,050.08 | [a] |
| | **$ 3,508,551.28** | **$ 2,237,790.40** | **$ 1,270,760.88** | |

**Notes:**
[a]   Calculation Error
[b]   Active and/or Term policy
[c]   Policy Not found in Union Central Data
[d]   I understand that on July 18, 2017, a "Joint stipulation to dismiss the claims of certain members of the PAT" was filed with the court. I show these
      claims above for the sole purpose of calculating the differences between my calculated Net Premiums Lost and those of Mr. Miller.



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Premium Loss Calculation - Excluding Stipulated Dismissed PAT Members**  **Schedule 4.2**

Data Sources:
<1> Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, Exhibit 10
<2> Union Central Insurance Data (UNION CENTRAL 0404362)

| Name | <1> Net Premium Lost Per Miller Report | <2> Adjusted Net Premium Lost | Amount of Error | |
|---|---|---|---|---|
| Adams, Donald | $ 40,304.65 | $ - | $ 40,304.65 | [c] |
| Allred, Geri L | 18,814.88 | 9,407.44 | 9,407.44 | [a] |
| Anderson, Nancy | 53,153.45 | 72,076.01 | (18,922.56) | [a] |
| Barratt, Craig and Sheri | 9,840.96 | - | 9,840.96 | [a] |
| Bennett, A Gary | 32,631.33 | - | 32,631.33 | [b] |
| Bergenthal, Kenneth | 139,980.12 | 243,506.72 | (103,526.60) | [a] |
| Bird, Gary A | 52,230.00 | - | 52,230.00 | [c] |
| Bladen, B Kent | 756,405.28 | 189,101.32 | 567,303.96 | [a] |
| Bladen, Christine M | 21,648.00 | - | 21,648.00 | [b] |
| Bradshaw, Mark | 196,446.74 | - | 196,446.74 | [b] |
| Brown, James Terry | - | 27,279.36 | (27,279.36) | [a] |
| Clements, Allen G | 36,177.54 | 7,879.49 | 28,298.05 | [a] |
| Crowl, Nancy A | 47,374.44 | 23,687.22 | 23,687.22 | [a] |
| Crowl, William D | 92,657.52 | 46,328.76 | 46,328.76 | [a] |
| Currey, Julia | - | 25,842.16 | (25,842.16) | [a] |
| Day, Brandi | 17,818.00 | - | 17,818.00 | [b] |
| Elizondo, Victoria B | - | 83,885.67 | (83,885.67) | [a] |
| Farnes, Loree D | 40,029.96 | 20,014.98 | 20,014.98 | [a] |
| Fluckiger, Blaine | 54,023.51 | 33,800.14 | 20,223.37 | [a] |
| Fluckiger, Debra | | 20,223.37 | (20,223.37) | [a] |
| Fonnesbeck, Chris J | 5,090.00 | - | 5,090.00 | [a] |
| Frodsham, Bret | 366,218.24 | 58,840.96 | 307,377.28 | [a] |
| Frodsham, Kristi | | 32,713.60 | (32,713.60) | [a] |
| Gelter, Aaron | 5,563.37 | 5,133.23 | 430.14 | [a] |
| Gibson, Brent | 14,554.86 | - | 14,554.86 | [a] |
| Gilbert, John | 1,389.08 | - | 1,389.08 | [a] |
| Gledhill, Brent | 18,778.88 | - | 18,778.88 | [a] |
| Goss, Tyson | 76,465.36 | 38,232.68 | 38,232.68 | [a] |
| Haas, Jr Paul F | 10,589.76 | - | 10,589.76 | [a] |
| Handy, Joan | 30,765.75 | 13,255.00 | 17,510.75 | [a] |
| Hansen, Wayne | - | 74,733.65 | (74,733.65) | [a] |
| Hiatt, Julie | 23,947.84 | - | 23,947.84 | [a] |
| Hooper, Danita | 80,322.97 | 80,322.97 | - | |
| Jaggi, Allen | 113,236.53 | 113,236.53 | - | |
| Jaggi, Heidi B | 9,345.84 | 9,345.84 | - | |
| Jens Nicholas Alexander Dienst Irrevocable Trust | 14,164.00 | 7,299.00 | 6,865.00 | [a] |
| Killpack, Bevan D | 124,792.92 | - | 124,792.92 | [a] |
| Leavitt, Jack | 36,000.00 | - | 36,000.00 | [b] |
| Lueders, Edward | 631.24 | - | 631.24 | [b] |
| Maughan, Josiah | 6,655.00 | 6,378.21 | 276.79 | [a] |
| Milne, Robert Brent | 143,989.00 | 143,988.81 | 0.19 | [a] |
| Morgan, Gary B | 10,452.14 | - | 10,452.14 | [a] |
| Myers, Darin R. | 1,862.80 | - | 1,862.80 | [a] |
| Nichol, Gerald | - | 77,717.50 | (77,717.50) | [a] |
| Pederson, Justin | 2,919.62 | - | 2,919.62 | [a] |
| Pendleton, Mitchell K | - | 20,627.40 | (20,627.40) | [a] |
| Petersen, Donald R | 10,185.75 | 10,185.75 | - | |
| Rawlings, Gennifer | 844.35 | - | 844.35 | [a] |



*Lone Peak Valuation Group*

**Gil A. Miller, Trustee of the Randal Victims PAT vs. Union Central, et al.**

**Premium Loss Calculation - Excluding Stipulated Dismissed PAT Members**          **Schedule 4.2**

*Data Sources:*
<1>  *Expert Report and Disclosure of Gil A. Miller, Case No. 2:14-cv-00575, June 26, 2017, Exhibit 10*
<2>  *Union Central Insurance Data (UNION CENTRAL 0404362)*

| Name | <1> Net Premium Lost Per Miller Report | <2> Adjusted Net Premium Lost | Amount of Error | |
|------|---------------------------------------:|------------------------------:|----------------:|---|
| Rawlings, Jody and Gennifer | 16,762.18 | - | 16,762.18 | [a] |
| Rowberry, Paul & Janice | 5,616.00 | - | 5,616.00 | [a] |
| Saltas, Terry P | 8,650.12 | 8,650.12 | - | |
| Samara Alexis Alina Dienst Irrevocable Trust | 14,164.00 | - | 14,164.00 | [a] |
| Savage, Brett | 8,260.98 | 29,896.35 | (21,635.37) | [a] |
| Shern, Joseph C | 1,069.46 | - | 1,069.46 | [a] |
| Smith, Jonathan | 43,169.82 | - | 43,169.82 | [a] |
| Smith, Matt M and Tonya C | 6,444.80 | - | 6,444.80 | [a] |
| Squire, Curtis E | 66,664.39 | 16,719.03 | 49,945.36 | [a] |
| Squire, Tina S | | 12,076.34 | (12,076.34) | [a] |
| Stinger, Janalee | 17,800.50 | 17,800.50 | - | |
| Stocker, Randal | 6,963.52 | - | 6,963.52 | [a] |
| Stokes, Norma | 6,924.00 | 55,777.68 | (48,853.68) | [a] |
| Tice, Thomas C | 169,846.14 | 45,769.84 | 124,076.30 | [a] |
| Tice, Ava A | | 36,720.00 | (36,720.00) | [a] |
| Vigil, Geneil | 39,536.00 | 18,535.55 | 21,000.45 | [a] |
| Vigil, Gerald | 18,535.55 | 21,000.00 | (2,464.45) | [a] |
| Watson, Troy G. and Kalynn | 26,050.08 | - | 26,050.08 | [a] |
| | $    3,174,759.22 | $    1,757,989.18 | $   1,416,770.04 | |

**Notes:**
[a]   Calculation Error
[b]   Active and/or Term policy
[c]   Policy Not found in Union Central Data



# Investment Losses *(Negligent Hiring)*



# Investment Losses *(Negligent Supervision and Negligent Retention)*



# Insurance Premium Losses

