| | |
|---|---|
| J. Thomas Beckett (5587)<br>Erik A. Christiansen (7372)<br>Alissa Mellem (13299)<br>**Parsons Behle & Latimer**<br>201 S. Main St., Suite 1800<br>Salt Lake City, UT 84111<br>Telephone:   (801) 532-1234<br>Facsimile:    (801) 536-6111<br>Email: ecf@parsonsbehle.com<br><br>Attorneys for Defendant<br>The Union Central Life Insurance Company | Robert D. Phillips, Jr. (pro hac vice)<br>Thomas A. Evans (pro hac vice)<br>Rachel A. Naor (pro hac vice)<br>**Alston & Bird LLP**<br>560 Mission Street, 21st Floor<br>San Francisco, CA  94105<br>Telephone: (415) 243-1999<br>Facsimile: (415) 243-1001<br>Email:  bo.phillips@alston.com<br>            tom.evans@alston.com<br>            rachel.naor@alston.com<br><br>Kathy J. Huang (pro hac vice)<br>**Alston & Bird LLP**<br>333 South Hope Street, 16th Floor<br>Los Angeles, CA  90071<br>Telephone: (213) 576-1000<br>Facsimile: (213) 576-1100<br>Email: kathy.huang@alston.com |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **GIL A. MILLER**, in his capacity as the Trustee of the Randall Victims Private Actions Trust,<br><br>               Plaintiff,<br><br>     vs.<br><br>**UNION CENTRAL LIFE INSURANCE COMPANY,**<br><br>               Defendant. | **DECLARATION OF WILLIAM POST IN SUPPORT OF DEFENDANT THE UNION CENTRAL LIFE INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:14-cv-00575-JNP-PMW<br><br>Honorable Jill N. Parrish<br>Magistrate Judge Paul M. Warner |

I, William Post, state as follows:

1.   I am over the age of 21 years and am legally competent to make this declaration.

2.  The statements made in this Declaration are true and correct based on the knowledge I have gained from the evidence and the many documents, records, and other information I have reviewed and other work that I have performed in the course of preparing my expert report dated August 8, 2017 in this matter.

3.  The statements made in this declaration are based on the knowledge I have gained from the evidence and the many documents, records, and other information I have reviewed and other work I and my team have performed in the course of our investigation on behalf of the Defendant and which were specifically identified in my expert report date August 8, 2017. I continue to rely on that evidence, those documents, records and other information identified in my August 8, 2017 report in preparing this declaration.  My analysis of the evidence, documents, records, and other information was conducted using reliable practices and methodologies that are standard in the fields of law and finance. Such evidence, documents, records, and other information are the types of information upon which professionals in the fields of law and finance typically rely, when such information is available, during investigations of this nature.  A copy of my CV, summarizing my qualifications is attached as Exhibit 1.

4.  I am aware that the Plaintiff in this matter filed a motion for summary judgment and alleged that the audited financial statements for Horizon Mortgage & Investment, Inc. (HMI), d/b/a Independent Financial & Investment (IFI) disclosed several additional details about Randall's companies, including:

- that HMI had "a significant deficit in stockholders' equity, raising substantial doubt about ability to continue as a going concern"
- that HMI's ability "to continue as a going concern is dependent on the Company obtaining additional capital to fund operating losses until it becomes profitable"

1

- that nearly all HMI's positive cash flow came from the issuance of notes payable; and

5. I have reviewed the motion for summary judgment and disagree with the Plaintiff's conclusion that a reading of the Independent Auditor's Report dated April 22, 2002 and prepared by Stayner & Associates LLC would have caused a reader of the audited report to believe that Horizon Mortgage and Investment, Inc. was at risk of failure and could not continue as a going concern.

### The Audited Financial Statements Of HMI Do Not Reveal Or Indicate That HMI Was Insolvent.

6. Miller's contention that HMI was insolvent is not supported by the evidence or the audited financial statements because the financial statement is not a complete or accurate reflection of the value of an enterprise. HMI was one part of an Enterprise of multiple operating companies with common ownership and assets such intangible assets, real estate and good will which are difficult to value but which would be included in the determination of the value of a business enterprise. Note 8 made in the Financial Statement dated December 31, 1999, for example, states that "the ability of the Company to continue as a going concern is dependent on the Company obtaining additional capital to fund operating loses until it becomes profitable." Obtaining additional working capital for businesses is an ongoing activity and it is not unusual for this activity to occur continuously over multiple years. In my experience it is common for companies as a whole or divisions within more complex corporate structures to operate at a loss for a short time or an extended time. Many companies require obtaining additional capital to continue as a going concern based on my experience and expertise. When a company such as HMI has common ownership with other profitable and related companies, it is not unusual for an inter-company transfer to cover losses in a related business. It is my opinion based on my experience and expertise that the audited financial statements would not have raised concerns about insolvency.

### Plaintiff's claim that HMI had "a significant deficit in stockholders' equity, raising substantial doubt about ability to continue as a going concern" does

**not reflect business reality.**

7. According to Tim Watts, a professor at the University of Alaska, Anchorage, "Shareholder equity…is seen more as an accounting function that can-but does not always-track the actual value of a company…. and corporate valuations tend to vary widely from their shareholder equity." For example, a company could be operating on the basis that they were carrying forward Net Operating Losses which cannot be booked as an asset. Further, if hard assets must be reported with depreciated values, this can also contribute to reduced shareholder equity. In my opinion and based on my experience over 30 years of reviewing financial statements, as long as a company's cash flow is adequate to meet bills, a company can operate indefinitely. Further negative shareholder equity would only indicate that in the event that the entity was dissolved, the company's liabilities would exceed their assets. However, any liquidation would not necessarily eliminate the obligation of the shareholder'(s) responsibility to pay any debts of the company if those debts were guaranteed by the shareholders. As a result, a shareholder would be highly incentivized to insure that the company owing the debt remained a going concern and that its business operations would be sufficient to retire any debt that the company owed. In other words, an owner/shareholder such as Dee Randall would have a great incentive to insure his business continued to operate successfully. Accordingly, negative shareholder equity, in the case of Horizon, would evidence a highly incentivized owner in Mr. Randall and this fact alone would not indicate that a company with negative shareholder equity was not able to continue as a going concern.

### Horizon Owned Untapped Equity Which Supported Horizon's Ability To Survive Was A Function Of Their Ability To Borrow.

8. Horizon had the ability to borrow by virtue of a highly appreciated portfolio of real estate and the ability for a company to pay its bills is also a function of its ability to borrow which is common necessity for many businesses. Horizon Mortgage held substantial assets in real estate which were presented in the audited report, which were presented with a certified appraised value well in excess of the net worth of that Horizon real estate portfolio. In my opinion, it would have been reasonable to assume that Horizon Mortgage would have had access

3

to credit to finance or pay bills in the event that the cash flow from their business operations was not adequate. It would be unreasonable to believe that a company that had negative shareholder equity and an appreciated real estate portfolio as represented in their audited financial statements was in financial extremis. Therefore, negative shareholder equity would not imply that a company is in danger of becoming insolvent or was at risk of going out of business.

> **The statement that "nearly all IFI's positive cash flow came from the issuance of notes payable" is not supported by nor can it be confirmed by reading the Horizon financial statements.**

9. This statement is not supported by the facts. In 2000 Horizon originated $282,930 in commercial loans. In 2001 they initiated $901,499 which is 69% more commercial loan business than the prior year. This increase in business would have also increased cash flow over the prior year. A review of the financial statement reveals that "Net Book Value" of property and equipment increased from $3.7mm to $4.1mm from 2000 to 2001. Assets increased from $6.5mm to $7.2mm which is an 11 percent increase in value.

I declare under penalty of perjury under the laws of the United States of America and the State of Utah that the foregoing is true and correct.

Executed this 30th day of October, 2017 at San Francisco, CA.

_____
William Post

4

# EXHIBIT 1

# BILL POST

600 Montgomery Street, 26th floor
San Francisco, Ca. 94111
wnp@caryburke.com
415-602 4554

## EMPLOYMENT

**MANAGING DIRECTOR – CARY BURKE LLC –** 2016 to present

Cary Burke provides strategic consulting and operational/business operations advice to the investment industry relating to high net worth platforms, private equity, venture and hedge funds, including marketing and private placement documentation, sales and marketing and institutional and high net worth client servicing. We also provide consulting services to the financial services industry including expert witness services regarding SEC/FINRA and industry compliance, fiduciary and suitable products standards.

**CO-NATIONAL PRACTICE LEADER - MANAGING DIRECTOR |** 2013 - 2016
**ALVAREZ & MARSAL INVESTMENT MANAGEMENT LLC**

A&M, founded in 1983, with over 2,700 professionals and revenues in excess of $1 billion, is a global consulting firm and leading advisor on business strategy working for 90% of the Fortune 1000 corporations.

**Managing Director, Co-National Practice Leader of A&M Investment business (AMIM)**, an SEC registered RIA, and served as Chief Investment Officer and Chief Compliance Office. AMIM provided fixed income management services to large institutional clients including corporations, state and local government and large foundations and endowments. Was responsible for all investment management activities, marketing and administrative requirements and managed assets in excess of $100mm.

**Managing Director, Consultuing and Expert Witness Services** relating to the Investment Industry with a specific focus on alternative investment vehicles such as Hedge Funds, Private Equity and Venture Funds. Expert witness work relates to compliance and fiduciary standards for SEC and FINRA registered investment advisors. Consulting work was focused on third party administrative and investment services (onshore-offshore) relating to alternative asset class investment managers, including marketing and private placement documentation, sales and marketing, institutional client servicing.

**SENIOR VICE PRESIDENT |** 2009 - 2013
**STONE & YOUNGBERG-STIFEL NICOLAUS & COMPANY, INC.**

Stifel Nicolaus is a full service national brokerage and investment banking firm established in 1890. Responsible for building and implementing a national Family Office - equity and fixed income advisory fee business. S&Y was the largest public finance company in the Western US.

**PRESIDENT AND MANAGING DIRECTOR |** 2004 - 2009
**BHP VENTURE INVESTMENTS**

Founded by Mr. Post and his partners in January 2004 as Multi Family Office investment management business with a focus on Alternative Assets including hedge funds, direct early round venture and private equity investments with portfolio companies of Silicon Valley venture firms of Kleiner Perkins, NEA and other Silicon Valley based investment funds such as Silver Lake, TPG, Fortress and KKR.

BHPVI advised its clients on asset allocation and the selection, due diligence and monitoring of asset managers in an open architecture environment in alternative investments including hedge funds, venture, private equity and real estate investments.

Mr. Post was the CIO and Portfolio Manager for separate accounts investing in global equity and fixed income. Mr. Post managed three large-cap strategies, concentrated (15 positions), value (25 positions) and S&P (80 positions).

**VICE CHAIRMAN & CEO |** 2001-2004

**FIDUCIARY TRUST INTERNATIONAL OF CALIFORNIA**

FTI is a multi-billion dollar investment management business providing Global Equity and Fixed Income and Alternative Asset (hedge funds/private equity) management services to institutional and HNW clients. Mr. Post was responsible for all investment and management of the business which operated in the 22 Western States. Responsible for the Franklin Templeton acquisition and integration and re-branding of Fiduciary Trust International. Mr. Post was a member of the management committee for Fiduciary Trust International, New York City.

**PRESIDENT & SENIOR MANAGING DIRECTOR |** 2000 - 2004
**FRANKLIN TEMPLETON ALTERNATIVE ASSETS**

Founder of FT Alternative Assets which managed two Hedge Fund of Funds with approximately 16 external hedge fund managers for each strategy. FWM managed global equity and fixed income separate accounts for ultra-high net worth clients, foundations and endowments. Responsible for all investment and management functions for both businesses.

**SENIOR VICE PRESIDENT |** 1995-2000
**CAPITAL GROUP COMPANIES, CAPITAL GUARDIAN TRUST COMPANY, CAPITAL RESEARCH (AMERICAN FUNDS)**

Responsible for developing Capital's HNW private asset management business in the Western United States including San Francisco, Seattle, Salt Lake City, Denver, San Diego and Houston. Responsibilities included Global Equity Portfolio management and client acquisition.

**VICE PRESIDENT |** 1994-1995
**WELLS FARGO SECURITIES, INC.**

Series 7 equity portfolio manager, assisted in the integration of Wells Fargo Securities with Wells Fargo Bank. Assisted in developing marketing and distribution strategies of investment products to high net worth clients

## ADDITIONAL LEGAL & FINANCIAL EXPERIENCE

- Attorney in private practice with a focus on corporate, securities, transactional law, private placements for real estate, startups, private equity, venture investing, limited partnerships and limited liability companies.
- Staff member, tax section, United States Senate Finance Committee, Office of Chief Legal Counsel.
- Staff member, Tax department, Touche Ross & Co.
- Teaching assistant, University of San Francisco School of Law

### LIEUTENANT, SUPPLY CORPS, UNITED STATES NAVY

- CFO and Controller, NARU, NAS Alameda, NARU NAS Moffet Field.
- Graduated from Navy Supply Corps School, Athens, Ga.
- Financial Management, Naval Postgraduate School, Monterey, Ca.

## PROFESSIONAL ASSOCIATIONS

Member of the: Chartered Financial Analyst Institute (CFA Institute)
CFA Society of San Francisco
Association of Financial Professionals (AFP)

## PROFESSIONAL LICENSES

State Bar of California and District of Columbia
FINRA series 7, 63, 65, formerly series 3

## EDUCATION

**UNIVERSITY OF VIRGINIA**, Charlottesville, Va.
BA, NROTC Scholarship recipient

**UNIVERSITY OF SAN FRANCISCO-KENDRICK SCHOOL OF LAW**, San Francisco, California
Juris Doctor Degree

**NAVAL POSTGRADUATE SCHOOL,** Monterey, California
Financial Management

**HARVARD BUSINESS SCHOOL, EXECUTIVE COURSE   2016**
CFA Institute Investment Management Course